The Law Firm of

# HILL, PETERSON, CARPER, BEE & DEITZLER, P.L.L.C.

R. Edison Hill*
James C. Peterson‡
W. Kent Carper
C. Michael Bee
Harry G. Deitzler
Sandra Brenneman Harrah
Susan B. Tucker‡
Kelli B. Hill

NorthGate Business Park ◊
500 Tracy Way
Charleston, WV 25311-1261

(304) 345-5667 ©
Fax (304) 345-1519

Writer's E-mail Address:
rehill@hpcbd.com

## ATTORNEY-CLIENT AGREEMENT

This Agreement, made and entered into this **11th** day of August, 2003, by and between Al Abramson, as Executor of the Estate of Joe Abramson, deceased, party(ies) of the first part, hereinafter referred to as the "Client," and the law firm of HILL, PETERSON, CARPER, BEE & DEITZLER, P.L.L.C., party of the second part, hereinafter referred to as the "Attorney," is as follows:

Whereas, on or about July 14, 2003, an incident occurred to the detriment of the Client (death of Joe Abramson), and the Client desires to employ the Attorney to institute and prosecute a claim or suit as the Attorney, which in the Attorney's sole discretion deems desirable or necessary:

Wherefore, the parties agree as follows:

I.    The Client employs the Attorney to represent the Client's best interest, and if necessary, to institute and prosecute suit. As compensation for legal services, the Client agrees to pay and hereby assigns unto the Attorney forty percent (40%) of all monies and things of value recovered in said claim, including an award of or receipt of the Attorney's fees, whether by compromise and settlement before suit, or whether suit goes to trial. If the Client's case goes to trial and an appeal is involved after the trial, then the Client agrees that five percent (5%) shall be added to the fee to which the Attorney is entitled according to the preceding sentence. It is recognized that this fee will not be payable until the conclusion of the appeal process.

II.   If settlement of this case is made by a structured settlement, the Attorney's fees will be figured on the basis of forty percent (40%) of the present cash value of the settlement as determined by actuarial experts, or by the amount of cash offered, plus the known cost of the annuity or annuities being purchased for the structured settlement. Further, the Attorney's fees will be paid out of the initial cash lump-sum payment.

AA

REH



EXHIBIT
A

*CERTIFIED CIVIL TRIAL
SPECIALIST BY: NATIONAL
BOARD OF TRIAL ADVOCACY

† LICENSED ALSO IN MINNESOTA
◊ OFFICES ALSO IN MORGANTOWN, WV

‡CERTIFIED CIVIL TRIAL
SPECIALIST BY: NATIONAL
BOARD OF TRIAL ADVOCACY
LICENSED ALSO MINN. & OHIO

HILL, PETERSON, CARPER, BEE & DEITZLER, P.L.L.C.

III.     The Client authorizes the Attorney to pay for court costs, fees, and other expenses to be incurred herein which the Attorney believes, in the Attorney's discretion, to be reasonable and necessary and the Client agrees to reimburse the Attorney for such expenses paid by the Attorney when the matter is ultimately resolved by way of suit or settlement, or upon termination of the Attorney's service by request or demand of the Client and/or his or her representative. The Client understands that expenses under this paragraph may include, but shall not be limited to, the cost of telephone toll charges, fax charges, photocopying charges, videotape services, access and time charges for use of computerized legal research banks, costs of necessary travel and meals, investigative fees, expert fees and expenses, court reporter fees, transcript costs, postage, and overnight delivery charges. The Client further understands that travel expenses for the Attorney, experts, the Client, and other persons working on behalf of the Client may include the use of aircraft or other transportation vehicles owned and operated by the law firm, which shall be reimbursed at the hourly or mileage rate established by the law firm, whichever is applicable. By example only, if the amount of the expenses incurred as referenced above total $5, and the Client's case is resolved for a total of $100, then the Attorney's fee amounts to $40, the Attorney is reimbursed the $5 in costs, and the Client nets the sum of $55. Expenses shall <u>not</u> include payment for the services of any other attorney who is employed to assist the Attorney pursuant to paragraph VIII below. The Client shall have the right to an accounting of expenses, costs, and fees at any time during the Attorney's representation.

IV.     The Attorney accepts employment on the condition that there appears to be a recoverable claim. If it appears after an investigation of the case that the claim is nonmeritorious, or that recovery of damages is unlikely, or that the amount will be too small, the Attorney may withdraw from representation.

V.      It is agreed that the Attorney is not obligated to appeal or in any way to represent the Client on an appeal in this case. The Client also is not obligated to appeal this case. If an appeal is made, both parties must agree to the appeal at the time when the appeal becomes necessary. The fee for any appeal shall be that fee stated in paragraphs I and II of this Agreement, unless otherwise agreed in writing. However, the other terms of the Attorney's representation of the Client on appeal shall be negotiated and set forth in writing at the time the appeal is taken, if the Attorney agrees to represent the Client on the appeal.

VI.     If an offer of settlement is made, and the Attorney recommends to the Client that the offer be accepted, but the Client refuses to accept the offer, the Attorney may withdraw from representing the Client, so long as withdrawal

AA                         REH

HILL, PETERSON, CARPER, BEE & DEITZLER, P.L.L.C.

can be accomplished without prejudicing the claim.   Neither the inconvenience and effort required to find replacement counsel nor the possibility that replacement counsel cannot be found in and of themselves constitutes prejudicing the claim.  If the Attorney withdraws under these circumstances, and one or more of the claims covered by this Agreement ultimately results in recovery, the Attorney will be entitled to fair compensation for the work done by the Attorney and to reimbursement of expenses advanced by the Attorney before withdrawing.  Fair compensation in this instance is defined as it is in paragraph VII.

VII.    If the Client discharges the Attorney, (a) the Attorney will be entitled to reimbursement of expenses, regardless of whether the claims covered by this Agreement produce any money, and (b) the Attorney will be entitled to fair compensation for the Attorney's work if there is ultimately a recovery on the claim. Fair compensation is defined as the part of the contingent fee that best represents the contribution made and risk assumed by the Attorney relative to the total of all contributions and risks viewed retrospectively as of the resolution of the claims covered by this Agreement.

VIII.   The Client does hereby authorize the Attorney to engage the services of any other attorney, for and on behalf of the Client, that is deemed to be in the best interest of the Client, so long as the fee charged to the Client is not altered in any way.  Client agrees to allow the Attorney to divide such fee received in any way the Attorney deems fair and advisable under the circumstances, so long as the Attorney notifies the Client in writing as to the name or names of such other attorneys who will share in such fee, along with disclosure of their respective fee splits.

IX.     The Client does hereby authorize the Attorney to withhold sums received by way of settlement or otherwise in the prosecution of this claim to pay for any fees, expenses, and medical bills incurred by or on behalf of the Client.  The Attorney will provide the Client with an accounting of all sums received on behalf of the Client and all disbursements made pursuant to this paragraph.

X.      The Client understands that the current file retention policy for the Attorney is seven (7) years from the conclusion of representation.  That means that any materials that are not immediately returned to the Client at the conclusion of representation will only be retained by the Attorney for seven (7) years.  At the end of seven (7) years, the Attorney will mail the Client notice at the Client's last-known address, advising that the file will be destroyed.  The Attorney does not accept the responsibility to otherwise notify the Client of file destruction.  If the Client wishes to make other arrangements to retain or preserve the file beyond the seven (7) year time period described herein, it

AA                    REH

HILL, PETERSON, CARPER, BEE & DEITZLER, P.L.L.C.

shall be the Client's responsibility to make such arrangements with the Attorney prior to the expiration of the seven (7) year period.

This Attorney-Client Agreement is agreed to in its entirety by the following:

Al Abramson, as Executor of the
Estate of Joe Abramson, deceased

R. Edison Hill
for HILL, PETERSON, CARPER, BEE & DEITZLER, P.L.L.C.
Attorneys at Law

173865



FILED

OCT 1 2 2004

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT HUNTINGTON

ALFRED ABRAMSON, individually and as
Executor of the Estate of JOSEPH
ABRAMSON, deceased, AARON ABRAMSON
and CAROL SCHUDMAK, individually

    PLAINTIFFS,

v.                              CIVIL ACTION NO. : 3:04-0489

DAVID BRUCE SMALL; LANEKO
MANUFACTURING COMPANY;
RBL LEASING CORPORATION,
DAVID BRUCE SMALL,
 UNITED SERVICES AUTOMOBILE ASSOCIATION,

    DEFENDANTS

## RULE 26(a)(1) and 2(a/b) INITIAL DISCLOSURE

NOW COME PLAINTIFFS, ALFRED ABRAMSON, individually and as

Executor of the Estate of JOSEPH ABRAMSON, deceased, AARON ABRAMSON

and CAROL SCHUDMAK, individually, through undersigned counsel, and file the

following Initial Disclosure pursuant to Rule 26(a)(1) of the Federal Rules of Civil

Procedure.  Plaintiffs reserve the right to supplement or amend their disclosures based on

additional information obtained through formal discovery or other means.

EXHIBIT

B

## A.   Individuals who may have discoverable information

1.   Carol Schudmak
     4624 Gray Mikel Street
     Metairie, Louisiana 70002-1460

2.   Samuel Schudmak
     4624 Gray Mikel Street
     Metairie, Louisiana 70002-1460

3.   Alfred Abramson
     1611 Audubon Street
     New Orleans, Louisiana 70118-5501

4.   Aaron Abramson
     1611 Audubon Street
     New Orleans, Louisiana 70118-5501

5.   Chief Alan Meek
     Barboursville Police Department
     721 Central Avenue
     Barboursville, Virginia 25504

6.   Officer M.C. McMillian
     Barboursville Police Department
     721 Central Avenue
     Barboursville, Virginia 25504

7.   Accident Scene Photographer and/or Detective Jim Copley
     Barboursville Police Department
     721 Central Avenue
     Barboursville, Virginia 25504

8.   Sgt. Curtis Tilley
     Instructor, Accident Investigation
     West Virginia State Police Academy
     Institute, West Virginia

9.    H.E. Gene Sigman
      Post Office Box 8253
      South Charleston, West Virginia 25303

10.   Cam Thompson
      Post Office Box 8253
      South Charleston, West Virginia 25303

11.   David Bruce Small
      126 Bethlehem Pike
      Colmar, PA 18915

12.   A representative of Laneko Manufacturing Company

13.   A representative of RBL Leasing Corporation

14.   Larry Hirschorn and/or other representative of Travelers Insurance Company

Any witness listed by any other party in any pleading, discovery response, Rule 26(a)(1) disclosure, or whose identity may surface through investigation and/or discovery.

## B.    Categories of Documents and data in Plaintiffs' possession

1.    WOWK Channel 13 videotape labeled "13-car Pile-up on I-64, 7/14/03"

2.    "Remembering Joe Abramson", a CD-ROM slide show with multiple photographic images of Joseph Abramson throughout the course of his life.

3.    Affidavit of Sergeant Curtis Tilley, West Virginia State Police

4.    Diagram of accident scene by Officer M.C. McMillian

5.    Approximately 600 photographs taken by Barboursville Police Department of accident scene and vehicles and of the corpse of Joseph Abramson.

6.    Coroner's Report WV-3003-557 and three photographs of corpse of Joseph Abramson.

7. Federal Motor Carrier Safety Regulations *in globo*.

8. Invoice for $10,568.48 from Bultman Funeral Home, New Orleans.

9. Personnel and wage records of Marshall University pertaining to Joseph Abramson.

10. Photographs of Joseph Abramson giving speech at podium and at desk.

11. Document appointing Alfred Abramson as executor of estate of Joseph Abramson.

12. Any other document or tangible thing listed by any other party in any pleading, discovery response, Rule 26 disclosure, or the existence and identification of which is learned through investigation and/or discovery.

## C.    Computation of damages

| | | | |
|---|---|---|---|
| 1. | Special Damages | $ | 855,025 |
| 2. | General Damages | | |
| | a.   Wrongful Death | $ | 2,800,000 |
| | b.   Survival Action | $ | 900,000 |
| | c.   Punitive Damages | $ | 1,044,975 |
| | TOTAL | $ | 5,600,000 |

## 2(a/b)   Expert witnesses

David Stopper
Stopper & Associates
6200 Evergreen Mountain Road
Broad Run, Virginia 20137

Johnathan L. Arden, M.D.
1400 Julia Avenue
McClean, Virginia 22101

Sgt. Curtis Tilley
Instructor, Accident Investigation
West Virginia State Police Academy
Institute, West Virginia

James A. Kaplan, M.D.
Chief Medical Examiner, State of West Virginia
Department of Health and Human Resources
Office of the Chief Medical Examiner
619 Virginia Street West
Charleston, West Virginia 25302

Zia Sabet, M.D.
Deputy Chief Medical Examiner, State of West Virginia
Department of Health and Human Resources
Office of the Chief Medical Examiner
619 Virginia Street West
Charleston, West Virginia 25302

Michael L. Brookshire
333 12th Street, Suite 3
Dunbar, West Virginia 25064

See attached expert reports and curriculum vitæ.

Respectfully submitted,

_Michael S. Bailey_

Michael S. Bailey (W.Va. Bar # 8507)
Bailey and Howard, L.L.C
642 Main Street, Suite 201
P.O. Box 347
Barboursville, West Virginia 25504
_phone_ (304) 736-0801
_fax_    (304) 736-0805

David V. Batt (La. Bar # 2849)
Lobman, Carnahan, Batt, Angelle &
     Nader
400 Poydras Street, Suite 2300
New Orleans, LA 70130
_phone_ (504)586-9292
_fax_ (504) 586-1290

**CERTIFICATE OF SERVICE**

do hereby certify that I have on this _____ 8 _____ day
of _____ July 200 _____ served a copy of the
foregoing pleading on counsel for all parties to this
proceeding by mailing the same by United States mail,
properly addressed, and first class postage prepaid.

**Jonathan L. Arden, MD**
**1400 Julia Ave.**
**Mclean, VA 22101**
**Business: 703-749-0227**
**Mobile: 202-270-1839**
jlardenmd@verizon.net

22 June 2004

David V. Batt, Esq.
Lobman, Carnahan, Batt, Angelle & Nader
400 Poydras St., Suite 2300
New Orleans, LA 70130-3245

Re: ***Abramson*** (your file # 500.04-8167)

Dear Mr. Batt:

This letter will serve as my report concerning the above-captioned case.

You have provided for my review:

- Autopsy report (including toxicology report) of Joseph Abramson, State of West Virginia Office of the Chief Medical Examiner, Case # WV 2003-557;
- Three autopsy photographs;
- Three photographs of Dr. Abramson's body at the death scene from the Barboursville Police Department;
- Three photographs of Dr. Abramson's vehicle at the crash scene; and
- Police report (including diagram) of 7/14/03 regarding the multi-vehicle crash on Interstate 64 in which Dr. Abramson died.

The autopsy report demonstrates that Dr. Abramson incurred multiple blunt impact injuries related to the vehicle crash in addition to the extensive subsequent thermal burns from the ensuing fire. Specifically, he had fractures (both front and back) of multiple ribs on both sides, contusions (bruising) of the fronts of both lungs, lacerations (tears or splits) of the liver, bleeding associated with the rib fractures (mild) and liver lacerations (approximately 200 ml), and fractures of the fourth cervical (neck) and second and third lumbar (lower back) vertebrae. The pattern of these injuries indicates impact to the front of the torso with front to back compression of the body, which is consistent with frontal deceleration during the crash.

He also suffered blunt impact to the head, which was manifested as hemorrhage (bleeding) in two anatomical locations called subdural and subarachnoid. The subdural bleeding was described as "large...over the entire brain" (but see below for assessment of this characterization); the subarachnoid bleeding was described as "mild." Note that the report specifically states that there were no skull fractures nor any intrinsic brain injuries.

The other type of injury to Dr. Abramson was severe thermal burning affecting the head/face, much of the front of the torso and areas on the extremities. Lesser degrees of thermal damage also involved other areas of the body surface as well as some of the internal organs. Again note that no soot was found in the airways or lungs, and the toxicologic testing revealed no carbon monoxide in the blood.

The presence of bleeding from the injuries, especially where there is a significant amount or accumulation of blood, indicates survival after the impact. (Significant bleeding requires a beating heart providing circulation and blood pressure, and therefore reflects survival after injury.) This principle also applies to the subdural bleeding, which occurs relatively slowly, as it originates from small veins (low pressure blood vessels). The presence of approximately 200 ml of blood in the abdomen from the liver lacerations and a "large" subdural hemorrhage is consistent with at least a few minutes of survival after the crash.

The impact injuries to the torso are potentially fatal by themselves. These would not render him unconscious until there had been sufficient bleeding from the injuries to cause severe shock (with risk of bleeding to death) and/or impairment of breathing caused by the rib fractures and lung bruises; neither of these is a rapid process, and would not occur until he was near death. Similarly, the thermal burns could be fatal *per se*, but would cause death by destruction of tissues directly involved by flames and by the indirect effects of heat, in essence cooking the brain. This, too, would not cause immediate unconsciousness. The absence of soot in the airways and of carbon monoxide in the blood indicates that there was no significant inhalation of the products of combustion (which is the more typical mechanism of death from a fire).

The final consideration is the likely effects of the head injuries. The subdural and subarachnoid hemorrhages indicate impact to the head. However, the autopsy report specifically notes the absence of any demonstrable injury within the brain. An actual brain injury resulting from the impact would likely cause unconsciousness. The subdural hemorrhage was characterized as "large." I interpret this to mean that it covered a large proportion of the surface area of the brain, but not to mean that it had accumulated a large enough volume to affect consciousness by compressing the brain. Had it done so, there would be localized areas of bleeding and/or tissue disruption caused by that pressure. As

2

Arden report *re* Abramson, 22 June 2004

mentioned above, subdural hemorrhage is typically slow bleeding; a lucid interval following the impact (while the blood accumulates) is characteristic of subdural hemorrhages.

Therefore, the autopsy findings and police investigation indicate that Dr. Abramson died from burning and heating in the fire. The impact injuries may have contributed to his death, but the amount of bleeding from them is not consistent with them having independently causing his death. It is my professional opinion that it is more likely than not that he consciously survived for a few minutes before he succumbed to his injuries and died.

I reserve the right to amend any opinions expressed if additional significant information is provided to me.

If I can be of any further assistance, please do not hesitate to contact me.

Yours truly,


Jonathan L. Arden, MD

3

**JONATHAN L. ARDEN, MD**
**1400 Julia Ave.**
**McLean, VA 22101**
**Business: 703-749-0227**
**Mobile: 202-270-1839**
**jlardenmd@verizon.net**

## Employment

| | |
|---|---|
| 12/03- present | Medical Examiner, Northern Virginia Region (part time) |

4/98-10/03     **Chief Medical Examiner**
**Office of the Chief Medical Examiner**
**1910 Massachusetts Ave., SE, Bldg. 27**
**Washington, DC 20003**

3/89-4/98     **Office of Chief Medical Examiner, City of New York**
**520 First Ave.**
**New York, NY 10010**

| 7/96-4/98: | First Deputy Chief Medical Examiner |
| 7/91-7/96: | Acting First Deputy Chief Medical Examiner |
| 8/89-6/91: | Deputy Chief Medical Examiner |
| 3/89-7/89: | Deputy Medical Examiner |

2/86-2/89     **Assistant Medical Examiner**
**Office of the Chief Medical Examiner, State of Delaware**

7/84-2/86     **Deputy Medical Examiner-Pathologist**
**Office of the Medical Examiner, Suffolk County, New York**

## Graduate Medical Training

7/83-6/84:     Resident in Forensic Pathology
Office of the Chief Medical Examiner
State of Maryland

7/80-6/83:     Resident in Anatomic Pathology
New York University Medical Center

## Education

University of Michigan Medical School: **MD**, 1980
University of Michigan: **BS** with High Distinction, 1976
The Johns Hopkins University, 1972-1974

## Medical Licensure

| 2003 | Virginia |
| 1998 | District of Columbia |
| 1986-2001 | Delaware |
| 1982 | New York (currently inactive) |

*Curriculum vitae* of Jonathan L. Arden, MD

## Board Certification

1985    Diplomate, American Board of Pathology, Anatomic and Forensic Pathology

## Professional Memberships

National Association of Medical Examiners (Board of Directors, 2002-2005)
Medical Society of the District of Columbia, 1998-2003

## Academic Appointments

Clinical Assistant Professor of Pathology, George Washington University School of Medicine,
        1998-2003
Clinical Assistant Professor of Pathology, State University of New York Health Sciences Center at
        Brooklyn, 1989-1998
Clinical Assistant Professor of Forensic Medicine, New York University School of Medicine,
        1989-1998

## Selected Professional Activities

Environmental Clearance Committee for the Curseen-Morris Postal Facility (co-sponsored by US
        Environmental Protection Agency and DC Department of Health), 2003
Government of the District of Columbia:
        Child Fatality Review Committee, 1998-2003
        Mental Retardation and Developmental Disabilities Administration
            Fatality Review Committee, Chair, 2000-2003
        Emergency Preparedness Task Force and Emergency Preparedness Committee,
            2001-2003
        Mayor's Health Policy Council, 1998-2003
Metropolitan Washington Council of Governments, Bio-terrorism Task Force, 2001-2003
Medical Society of the District of Columbia, Family Violence Task Force, 2000-2003
National Association of Medical Examiners, Interim Meeting, Program Chair, February 1997
New York State Commission on Domestic Violence Fatalities, 1996-1997
American Board of Pathology, Forensic Pathology Test Committee, 1992-1997
City of New York, Administration for Children's Services/Human Resources Administration, Child
        Fatality Review Panel, 1989-1998
City of New York, Criminal Justice Child Abuse Task Force, 1996-1998
New York City Multidisciplinary Child Fatality Review Team, Project Director, 1995-1998
Physician Assistant Program, The Brooklyn Hospital-Long Island University, Pathology Course
        Director, 1991-1997
Teaching and lecturing for various audiences, including: physicians, graduate medical trainees
and medical students, nurses and physician assistants, law enforcement, prosecutors and
defense attorneys, and interdisciplinary government panels.  Topics include:
   • pediatric forensic pathology (child abuse and neglect, sudden infant death syndrome)
   • death investigation
   • deaths in custody
   • sudden natural deaths
   • mistakes in homicide investigations
   • death certification
   • courtroom testimony and procedures

2

*Curriculum vitae* of Jonathan L. Arden, MD

## Publications

Shuangshoti S, Hjardemaal GM, Ahmad Y, Arden JL and Herman MM. Concurrence of multiple sclerosis and glioblastoma multiforme. Clin. Neuropath. 22:304-8, 2003.

Borio L, Frank D, Mani V, Chiriboga C, Pollanen M, Ripple M, Ali S, DiAngelo C, Lee J, Arden J, Titus J, Fowler D, O'Toole T, Masur H, Bartlett J, Inglesby T. Death due to bioterrorism-related inhalational anthrax: report of 2 patients. JAMA. 2001 Nov 28; 286(20):2554-9.

Flomenbaum MA, Arden JL. Final Considerations: Interacting with the Medical Examiner, Chapter 24 in *Emergency Diagnostic Testing, 2ⁿᵈ Ed*, Flomenbaum NE, Goldfrank L and Jacobson S, eds. Mosby-Yearbook, Philadelphia, PA 1995

Fried KS, Arden JL, Gouge TH, Balthazar EJ. Multifocal granular cell tumors of the gastrointestinal tract. Am J Gastroenterology 79(10):751-755, 1984

Smialek JE, Arden JL, Monforte JR. Changes observed in blood carbon monoxide levels due to decomposition. Abstract #c10, presented at National Association of Medical Examiners meeting, Miami, FL, 1981

Han SS, Holmstedt J, Geha-Mitzel M, Pirbazari M, Arden JL. *Biology of Aging*. Published by Program in Biology of Aging, University of Michigan Institute of Gerontology, Ann Arbor, MI, 1979

## AFFIDAVIT OF SERGEANT CURTIS TILLEY
## WEST VIRGINIA STATE POLICE

I am a member of the West Virginia State Police, and I instruct in accident investigation at the West Virginia State Police Academy, located in Institute, West Virginia. I was called by the Chief of Police of Barboursville, West Virginia, to assist in the investigation and accident reconstruction of a wreck on Interstate 64 that occurred on July 14, 2003, involving thirteen vehicles. During the course of my investigation at the scene of the accident, I observed the vehicle, a 1998 Mercury Marquis, owned and which was being driven prior to the wreck by Joseph Abramson. This vehicle was badly damaged as a result of the collision, and the driver, Joseph Abramson, was killed. Fire destroyed much of this vehicle, including all seatbelts and all other nonmetal parts on the interior of the vehicle. I did observe the body of the deceased, Joseph Abramson, in the vehicle, and the manner in which I observed his body lying was consistent with his having had his seatbelt on (lap and shoulder harness) at the time of the collision. His torso was contained within the seat, although his body was lying down. There was no evidence that he had been thrown about the interior of the vehicle, and if he had not had his seatbelt on, we would have expected to find him in a different location, with the steering wheel and dash (knee board) damaged. There was no evidence to his body that his legs or knees had been thrown into the dash underneath the steering wheel. Accordingly, it is my professional opinion that Joseph Abramson was wearing and utilizing his seatbelt at the time he was struck from behind by the tractor-trailer being operated by RBL Leasing Corporation. The seatbelt itself was destroyed by fire.

_____
SERGEANT CURTIS TILLEY

STATE OF WEST VIRGINIA,

COUNTY OF KANAWHA, to wit:

On the _22nd_ day of _September_ 2003, Sergeant Curtis Tilley personally appeared before the undersigned Notary Public and executed the within instrument.

My commission expires: _January 31, 2006_

_____
NOTARY PUBLIC

[SEAL]
00174941

OFFICIAL SEAL
NOTARY PUBLIC, STATE OF WEST VIRGINIA
PENNY L. BICE
HILL, PETERSON, CARPER, BEE & DEITZLER, PLLC
NORTHGATE BUSINESS PARK, 120 TRACY WAY
CHARLESTON, WV 25311-1261
My Commission Expires Jan. 31, 2006

IN THE CASE OF

# JOSEPH ABRAMSON

## ANALYSIS OF

# PRESENT VALUE OF LOST EARNING CAPACITY

### CERTIFICATION

We hereby certify that we have no interest, present or contemplated, in the above matter and that neither the employment to make the appraisal nor the compensation is contingent on the amount of the appraisal.

We certify that according to our belief and knowledge, all statements and information in the report are true and correct, subject to the underlying assumptions. We further certify that we adhere to the tenets of ethical behavior outlined in the National Association of Forensic Economics "Statement of Ethical Principles."

*Michael L. Brookshire*

**Michael L. Brookshire, Ph.D.**
**Forensic Economist**
**November 25, 2003**

MICHAEL L. BROOKSHIRE & ASSOCIATES
Charleston, WV (304) 766-6384

## TABLE OF CONTENTS

Case Narrative ...................................................................................................i

TABLE

Present Value of Lost Earning Capacity...................................................................3
(With Continuous Employment)

Present Value of Lost Earning Capacity...................................................................6
(With Work-Life Adjustments)

Summary...................................................................................................7

APPENDIX

Real Wage Growth Trend...................................................................................I

Inflation Graph...................................................................................II

Actual Compensation/Actual Interest/Inflation Graph...................................................III

Real Compensation/Real Interest Graph ...................................................................IV

Book Illustration of Hand-Drawn Graph...................................................................V

This analysis of lost earning capacity is based upon the statistics in Tables 1-7 and upon the following facts and assumptions.

1. Joseph Abramson was a white male who was born on October 12, 1946 and who died on July 14, 2003. Dr. Abramson was a college graduate with a Ph.D. in Marketing.

2. At the time of his death, Dr. Abramson was employed by Marshall as a full professor. Lost earning capacity is based upon his last full year of earnings, or $85,943 in 2002 dollars.

3. Employer contributions to fringe benefits, such as social security, pension, and health and welfare plans, range from 17.94 to 19.44 percent of wages. These percentages are based upon actual employer contributions and national statistics from an annual survey by the U. S. Chamber of Commerce.

4. Earning capacity "with work-life adjustments" can be found by computing the earning capacity each year and ending estimates at Dr. Abramson's "work-life" expectancy age of 66 on October 11, 2012.

5. The impact of inflation on earnings and on interest rates is offsetting; the present value of lost earning capacity can be found by computing "real" increases in earnings and by discounting to present value using the "real" rate of interest. The net discount rate for these calculations is 2.59 percent annually (see Appendix I).

Based upon these facts and assumptions, the present value of lost earning capacity with continuous employment is $1,727,666 (Table 3). The present value of lost earning capacity with adjustments for work-life expectancy is $844,457 (Table 6). These projections are summarized in Table 7.

i

## TABLE 1

### PRESENT VALUE OF LOST WAGES
### WITH CONTINUOUS EMPLOYMENT
### IN THE CASE OF JOSEPH ABRAMSON
### 2003 - 2025

| YEAR | AGE | WAGES | DISCOUNT FACTOR | PRESENT VALUE | CUMULATIVE |
|------|-----|-------|-----------------|---------------|------------|
| 2003 | 57 | $40,028 | 1.00000 | $40,028 | $40,028 |
| 2004 | 58 | $85,943 | .97475 | $83,773 | $123,801 |
| 2005 | 59 | $85,943 | .95015 | $81,658 | $205,459 |
| 2006 | 60 | $85,943 | .92816 | $79,597 | $285,056 |
| 2007 | 61 | $85,943 | .90278 | $77,587 | $362,643 |
| 2008 | 62 | $85,943 | .87998 | $75,628 | $438,271 |
| 2009 | 63 | $85,943 | .85777 | $73,719 | $511,990 |
| 2010 | 64 | $85,943 | .83611 | $71,858 | $583,848 |
| 2011 | 65 | $85,943 | .81500 | $70,044 | $653,892 |
| 2012 | 66 | $85,943 | .79443 | $68,276 | $722,168 |
| 2013 | 67 | $85,943 | .77437 | $66,552 | $788,720 |
| 2014 | 68 | $85,943 | .75482 | $64,872 | $853,592 |
| 2015 | 69 | $85,943 | .73577 | $63,234 | $916,826 |
| 2016 | 70 | $85,943 | .71719 | $61,638 | $978,464 |
| 2017 | 71 | $85,943 | .69908 | $60,081 | $1,038,545 |
| 2018 | 72 | $85,943 | .68144 | $58,565 | $1,097,110 |
| 2019 | 73 | $85,943 | .66423 | $57,086 | $1,154,196 |
| 2020 | 74 | $85,943 | .64746 | $55,645 | $1,209,841 |
| 2021 | 75 | $85,943 | .63112 | $54,240 | $1,264,081 |
| 2022 | 76 | $85,943 | .61518 | $52,871 | $1,316,952 |
| 2023 | 77 | $85,943 | .59965 | $51,536 | $1,368,488 |
| 2024 | 78 | $85,943 | .58451 | $50,235 | $1,418,723 |
| 2025 | 79 | $80,998 | .56976 | $46,149 | $1,464,872 |

$1,464,872

**TABLE 2**

### PRESENT VALUE OF LOST FRINGE BENEFITS
### WITH CONTINUOUS EMPLOYMENT
### IN THE CASE OF JOSEPH ABRAMSON
### 2003 - 2025

| YEAR | AGE | FRINGE BENEFITS | DISCOUNT FACTOR | PRESENT VALUE | CUMULATIVE |
|------|-----|-----------------|-----------------|---------------|------------|
| 2003 | 57 | $7,181 | 1.00000 | $7,181 | $7,181 |
| 2004 | 58 | $15,418 | .97475 | $15,029 | $22,210 |
| 2005 | 59 | $15,418 | .95015 | $14,649 | $36,859 |
| 2006 | 60 | $15,418 | .92616 | $14,279 | $51,138 |
| 2007 | 61 | $15,418 | .90278 | $13,919 | $65,057 |
| 2008 | 62 | $15,418 | .87998 | $13,568 | $78,625 |
| 2009 | 63 | $15,418 | .85777 | $13,225 | $91,850 |
| 2010 | 64 | $15,418 | .83611 | $12,891 | $104,741 |
| 2011 | 65 | $15,418 | .81500 | $12,566 | $117,307 |
| 2012 | 66 | $15,418 | .79443 | $12,248 | $129,555 |
| 2013 | 67 | $15,418 | .77437 | $11,939 | $141,494 |
| 2014 | 68 | $15,418 | .75482 | $11,638 | $153,132 |
| 2015 | 69 | $15,418 | .73577 | $11,344 | $164,476 |
| 2016 | 70 | $15,418 | .71719 | $11,058 | $175,534 |
| 2017 | 71 | $15,418 | .69908 | $10,778 | $186,312 |
| 2018 | 72 | $15,418 | .68144 | $10,506 | $196,818 |
| 2019 | 73 | $15,418 | .66423 | $10,241 | $207,059 |
| 2020 | 74 | $15,418 | .64746 | $9,983 | $217,042 |
| 2021 | 75 | $15,418 | .63112 | $9,731 | $226,773 |
| 2022 | 76 | $15,418 | .61518 | $9,485 | $236,258 |
| 2023 | 77 | $15,418 | .59965 | $9,245 | $245,503 |
| 2024 | 78 | $15,418 | .58451 | $9,012 | $254,515 |
| 2025 | 79 | $14,531 | .56976 | $8,279 | $262,794 |

$262,794

**TABLE 3**

**PRESENT VALUE OF LOST EARNING CAPACITY**
**WITH CONTINUOUS EMPLOYMENT**
**IN THE CASE OF JOSEPH ABRAMSON**
**2003 - 2025**

| YEAR | AGE | WAGES | FRINGE BENEFITS | TOTAL | CUMULATIVE |
|------|-----|-------|-----------------|-------|------------|
| 2003 | 57 | $40,028 | $7,181 | $47,209 | $47,209 |
| 2004 | 58 | $83,773 | $15,029 | $98,802 | $146,011 |
| 2005 | 59 | $81,658 | $14,649 | $96,307 | $242,318 |
| 2006 | 60 | $79,597 | $14,279 | $93,876 | $336,194 |
| 2007 | 61 | $77,587 | $13,919 | $91,506 | $427,700 |
| 2008 | 62 | $75,628 | $13,568 | $89,196 | $516,896 |
| 2009 | 63 | $73,719 | $13,225 | $86,944 | $603,840 |
| 2010 | 64 | $71,858 | $12,891 | $84,749 | $688,589 |
| 2011 | 65 | $70,044 | $12,566 | $82,610 | $771,199 |
| 2012 | 66 | $68,276 | $12,248 | $80,524 | $851,723 |
| 2013 | 67 | $66,552 | $11,939 | $78,491 | $930,214 |
| 2014 | 68 | $64,872 | $11,638 | $76,510 | $1,006,724 |
| 2015 | 69 | $63,234 | $11,344 | $74,578 | $1,081,302 |
| 2016 | 70 | $61,638 | $11,058 | $72,696 | $1,153,998 |
| 2017 | 71 | $60,081 | $10,778 | $70,859 | $1,224,857 |
| 2018 | 72 | $58,565 | $10,506 | $69,071 | $1,293,928 |
| 2019 | 73 | $57,086 | $10,241 | $67,327 | $1,361,255 |
| 2020 | 74 | $55,645 | $9,983 | $65,628 | $1,426,883 |
| 2021 | 75 | $54,240 | $9,731 | $63,971 | $1,490,854 |
| 2022 | 76 | $52,871 | $9,485 | $62,356 | $1,553,210 |
| 2023 | 77 | $51,536 | $9,245 | $60,781 | $1,613,991 |
| 2024 | 78 | $50,235 | $9,012 | $59,247 | $1,673,238 |
| 2025 | 79 | $46,149 | $8,279 | $54,428 | $1,727,666 |
| | | $1,464,872 | $262,794 | $1,727,666 | |

**TABLE 4**

### PRESENT VALUE OF LOST WAGES
### WITH WORK-LIFE ADJUSTMENTS
### IN THE CASE OF JOSEPH ABRAMSON
### 2003 - 2012

| YEAR | AGE | WAGES | DISCOUNT FACTOR | PRESENT VALUE | CUMULATIVE |
|------|-----|-------|-----------------|---------------|------------|
| 2003 | 57 | $40,028 | 1.00000 | $40,028 | $40,028 |
| 2004 | 58 | $85,943 | .97475 | $83,773 | $123,801 |
| 2005 | 59 | $85,943 | .95015 | $81,658 | $205,459 |
| 2006 | 60 | $85,943 | .92616 | $79,597 | $285,056 |
| 2007 | 61 | $85,943 | .90278 | $77,587 | $362,643 |
| 2008 | 62 | $85,943 | .87998 | $75,628 | $438,271 |
| 2009 | 63 | $85,943 | .85777 | $73,719 | $511,990 |
| 2010 | 64 | $85,943 | .83611 | $71,858 | $583,848 |
| 2011 | 65 | $85,943 | .81500 | $70,044 | $653,892 |
| 2012 | 66 | $66,870 | .79443 | $53,123 | $707,015 |

$707,015

MICHAEL L. BROOKSHIRE & ASSOCIATES
Charleston, WV (304) 768-6384

### TABLE 5

### PRESENT VALUE OF LOST FRINGE BENEFITS
### WITH WORK-LIFE ADJUSTMENTS
### IN THE CASE OF JOSEPH ABRAMSON
### 2003 - 2012

| YEAR | AGE | FRINGE BENEFITS | DISCOUNT FACTOR | PRESENT VALUE | CUMULATIVE |
|------|-----|-----------------|-----------------|---------------|------------|
| 2003 | 57 | $7,781 | 1.00000 | $7,781 | $7,781 |
| 2004 | 58 | $16,707 | .97475 | $16,285 | $24,066 |
| 2005 | 59 | $16,707 | .95015 | $15,874 | $39,940 |
| 2006 | 60 | $16,707 | .92616 | $15,473 | $55,413 |
| 2007 | 61 | $16,707 | .90278 | $15,083 | $70,496 |
| 2008 | 62 | $16,707 | .87998 | $14,702 | $85,198 |
| 2009 | 63 | $16,707 | .85777 | $14,331 | $99,529 |
| 2010 | 64 | $16,707 | .83611 | $13,969 | $113,498 |
| 2011 | 65 | $16,707 | .81500 | $13,616 | $127,114 |
| 2012 | 66 | $13,000 | .79443 | $10,328 | $137,442 |

$137,442

## TABLE 6

### PRESENT VALUE OF LOST EARNING CAPACITY
### WITH WORK-LIFE ADJUSTMENTS
### IN THE CASE OF JOSEPH ABRAMSON
### 2003 - 2012

| YEAR | AGE | WAGES | FRINGE BENEFITS | TOTAL | CUMULATIVE |
|------|-----|-------|-----------------|-------|------------|
| 2003 | 57 | $40,028 | $7,781 | $47,809 | $47,809 |
| 2004 | 58 | $83,773 | $16,285 | $100,058 | $147,867 |
| 2005 | 59 | $81,658 | $15,874 | $97,532 | $245,399 |
| 2006 | 60 | $79,597 | $15,473 | $95,070 | $340,469 |
| 2007 | 61 | $77,587 | $15,083 | $92,670 | $433,139 |
| 2008 | 62 | $75,628 | $14,702 | $90,330 | $523,469 |
| 2009 | 63 | $73,719 | $14,331 | $88,050 | $611,519 |
| 2010 | 64 | $71,858 | $13,969 | $85,827 | $697,346 |
| 2011 | 65 | $70,044 | $13,616 | $83,660 | $781,006 |
| 2012 | 66 | $53,123 | $10,328 | $63,451 | $844,457 |
| | | $707,015 | $137,442 | $844,457 | |

## TABLE 7

### SUMMARY OF THE PRESENT VALUE OF
### LOST EARNING CAPACITY
### IN THE CASE OF JOSEPH ABRAMSON
### 2003 – 2025

LOST EARNING CAPACITY WITH CONTINUOUS EMPLOYMENT       $1,727,666

LOST EARNING CAPACITY WITH WORK-LIFE ADJUSTMENTS       $  844,457

APPENDIX I

## CALCULATION OF TREND RATES OF REAL WAGE GROWTH, REAL INTEREST (DISCOUNT) RATES, AND THE NET DISCOUNT RATE

| YEAR | WAGE[1] | | INTEREST/DISCOUNT[2] | | CPI[3] | | REAL WAGE CHANGE | REAL INTEREST CHANGE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | INDEX | PERCENT INCREASE | INDEX | RATE | INDEX | PERCENT INCREASE | | |
| 1982 | 63.80 | | 1.0000 | | 96.50 | | | |
| 1983 | 66.50 | 4.23 | 1.0894 | 8.94 | 99.60 | 3.21 | 1.02 | 5.73 |
| 1984 | 69.40 | 4.36 | 1.1978 | 9.95 | 103.90 | 4.32 | 0.04 | 5.63 |
| 1985 | 72.90 | 5.04 | 1.2904 | 7.73 | 107.60 | 3.56 | 1.48 | 4.17 |
| 1986 | 76.70 | 5.21 | 1.3699 | 6.16 | 109.60 | 1.86 | 3.35 | 4.30 |
| 1987 | 79.70 | 3.91 | 1.4519 | 5.99 | 113.60 | 3.65 | 0.26 | 2.34 |
| 1988 | 83.50 | 4.77 | 1.5521 | 6.90 | 118.30 | 4.14 | 0.63 | 2.76 |
| 1989 | 85.80 | 2.75 | 1.6826 | 8.41 | 124.00 | 4.82 | -2.06 | 3.59 |
| 1990 | 90.70 | 5.71 | 1.8132 | 7.76 | 130.70 | 5.40 | 0.31 | 2.36 |
| 1991 | 95.00 | 4.74 | 1.9142 | 5.57 | 136.20 | 4.21 | 0.53 | 1.36 |
| 1992 | 100.00 | 5.26 | 1.9818 | 3.53 | 140.30 | 3.01 | 2.25 | 0.52 |
| 1993 | 102.50 | 2.50 | 2.0430 | 3.09 | 144.50 | 2.99 | -0.49 | 0.10 |
| 1994 | 104.50 | 1.95 | 2.1329 | 4.40 | 148.20 | 2.56 | -0.61 | 1.84 |
| 1995 | 106.70 | 2.11 | 2.2539 | 5.67 | 152.40 | 2.83 | -0.73 | 2.84 |
| 1996 | 110.10 | 3.19 | 2.3701 | 5.16 | 156.90 | 2.95 | 0.23 | 2.21 |
| 1997 | 113.50 | 3.09 | 2.4936 | 5.21 | 160.50 | 2.29 | 0.79 | 2.92 |
| 1998 | 119.70 | 5.46 | 2.6168 | 4.94 | 163.00 | 1.56 | 3.90 | 3.38 |
| 1999 | 125.20 | 4.59 | 2.7419 | 4.78 | 166.60 | 2.21 | 2.39 | 2.57 |
| 2000 | 133.80 | 6.87 | 2.9070 | 6.02 | 172.20 | 3.36 | 3.51 | 2.66 |
| 2001 | 137.70 | 2.91 | 3.0096 | 3.53 | 177.10 | 2.85 | 0.07 | 0.68 |
| 2002 | 141.80 | 2.98 | 3.0592 | 1.65 | 179.90 | 1.58 | 1.40 | 0.07 |
| AVERAGE | | 4.07 | | 5.75 | | 3.16 | 0.91 | 2.59 |

Net Discount Rate: 1.68%/Year
If real wage growth is zero, the
Net Discount Rate becomes 2.59%/Year

Update of 2/14/2003.

[1]Wage Hourly Compensation: Major Sector Productivity and Costs Index, Business Sector – All Persons, Bureau of Labor Statistics, February 12, 2003.

[2]Interest Rates: Bond Yield and Interest Rates, 1929-2002; Economic Report of the President 2003.

[3]CPI: Consumer Price Index, All Urban Consumers (CPI-U), U. S. City Average – All Items, Bureau of Labor Statistics, February 12, 2003.

APPENDIX II

# ANNUAL RATE OF PRICE INFLATION

## 1962-2002

F



**YEARS**

■ Inflation

# WAGE, INTEREST, AND INFLATION RATES

## 1962-2002



MICHAEL L. BROOKSHIRE & ASSOCIATES
Charleston, WV (304) 786-5384

APPENDIX IV

# EAL WAGE AND REAL INTEREST RATES

## 1962-2002

F



—■— Real Wage   —▲— Real Interest

MICHAEL L. BROOKSHIRE & ASSOCIATES
Charleston, WV (304) 766-5384

APPENDIX V

<u>Illustration from Brookshire 1990 Book* of Chart to be Prepared for Trial, Explaining
How Lump Sum (Present Value) Losses, and all Earned Interest, are Exhausted in
Restoring Annual, Economic Losses.</u>

## CHART 2

## ILLUSTRATION OF HOW A $605,795 LUMP SUM EXACTLY RESTORES ECONOMIC LOSS AND IS ENTIRELY USED UP IN THE PROCESS

F



*Michael L. Brookshire and Stan V. Smith, ECONOMIC/HEDONIC DAMAGES: The Practice Book for Plaintiff and Defense Attorneys (Cincinnati: Anderson, 1990), p.220

MICHAEL L. BROOKSHIRE & ASSOCIATES
Charleston, WV (304) 755-6384

MAY 1, 2003

# VITA
# MICHAEL L. BROOKSHIRE

## General Information:

**Address:**
> 1934 Olympus Road
> Charleston, WV 25314-2284

**Michael L. Brookshire & Associates**
**Office Address:**

> 333 12th Street, Suite 3
> P.O. Box 546
> Dunbar, WV 25064

**Phone:**
(304) 746-1967 - College
**OR**
(304) 766-6384 – Office
**OR**
(304) 343-5280 – Home
**OR**
(304) 768-1643 – FAX

**E-Mail:**
mbrookshire@marshall.edu
brookshire@forensiceconomics.org

## Academic Background:

| | |
|---|---|
| March 1975 | Ph.D. in Economics; University of Tennessee, Knoxville with concentrations in the Economics of Labor and Human Resources; Industrial Organization; Finance. |
| June 1971 | B.S. in Economics summa cum laude; University of Tennessee, Knoxville. |

## Books:

Michael L. Brookshire and Stan Smith, Economic/Hedonic Damages: The Practice Book for Plaintiff and Defense Attorneys (Cincinnati: Anderson Publishing Company, 1990); 1991-92 Annual Supplement #1 (Fall 1991); 1992-93 Annual Supplement #2 (Fall 1992).

Michael L. Brookshire, Economic Damages: A Handbook for Plaintiff and Defense Attorneys (Cincinnati: Anderson Publishing Company, 1987).

Michael L. Brookshire and Michael D. Rogers, Collective Bargaining in Public Employment (Lexington, Massachusetts: D.C. Heath and Co., 1977).

**Other Publications:**

Michael L. Brookshire, "A History of the National Association of Forensic Economics, 1986-2001," Litigation Economics Review, forthcoming.

Michael L. Brookshire, The Forensic Economist and the Psychologist: Economic Damages as a Result of Psychological Trauma," Journal of Forensic Vocational Analysis, forthcoming.

Michael L. Brookshire, "The Economist, the Disability Analyst, and Other Experts on Damages in Catastrophic Injury," The Catastrophic Injury Handbook, Kenneth Anchor, et al., editors (Dubuque, Iowa: Kendall/Hunt, 2003), pp. 86-92.

George A. Barrett and Michael L. Brookshire, "The Forensic Economics of Medical Monitoring Protocols," Litigation Economics Review, 2002, Vol. 5, No. 2, pp. 15-26.

Michael L. Brookshire and Elizabeth A. W. Gunderson, "Estimating Lost Household Services: Persons Over 50," Journal of Forensic Economics, Winter 2000, Vol. XIII, No. 1, pp. 11-21.

Michael L. Brookshire and Frank Slesnick, "A 1999 Survey Study of Forensic Economists – Their Methods and Their Estimates of Forecast Variables," Litigation Economics Digest, Fall 1999, Vol. IV, No. 2, pp. 65-96.

Patrick A. Gaughan, Michael L. Brookshire and William E. Cobb, "Economic Issues: Evaluating Damages," Chapter 22 of Commercial Damages (New York: Matthew Bender, 1999). Previous chapters published by Brookshire and Cobb in 1986, 1989, and 1992.

Michael L. Brookshire and George Barrett, "Worklife and LPE," in Gerald D. Martin and Ted Vavoulis', Determining Economic Damages (Costa Mesa, California: James Publishing, 1999).

Michael L. Brookshire "The Forensic Economist for the Defense," For The Defense, February 1999, Vol. 41, No. 2, pp. 23-28.

Robert J. Thornton, James D. Rodgers, and Michael L. Brookshire, "On the Interpretation of Age-Earnings Profiles," Journal of Labor Research, Spring 1997, Vol. XVIII, No. 2, pp. 351-365.

Michael L. Brookshire and Frank Slesnick, "Prevailing Practice in Forensic Economics: A 1996 Survey Study," Journal of Forensic Economics, Winter 1997, Vol. X, No. 1, pp. 1-28.

James D. Rodgers, Michael L. Brookshire and Robert J. Thornton, "Forecasting Earnings Using Age-Earnings Profiles and Longitudinal Data," Journal of Forensic Economics, Spring/Summer 1996, Vol. IX, Number 2, pp. 169-210.

2

Michael L. Brookshire, William E. Cobb, and Anthony Gamboa, "Assessing Damages in Cases of Partial Disability Through Use of a Vocational/Economic Assessment of Work-Life Expectancy," Trial, March 1987, pp. 44-47.

Michael L. Brookshire, "Productivity and Collective Bargaining," Survey of Business, September 1986.

Dennis Brady, Michael L. Brookshire, and William E. Cobb, "The Development and Solution of a Tax-Adjusted Model for Personal Injury Awards," Journal of Risk and Insurance March 1984. Also, "Response" to comments on this article was later published.

Michael L. Brookshire and William E. Cobb, "Age Discrimination in Employer-Provided Protection Against the Risk of Disability," Aging and Work, December 1983, Vol. 6, No. 3.

Michael L. Brookshire and William E. Cobb, "The Life-Participation-Employment Approach to Work-Life Expectancy in Personal Injury and Wrongful Death Cases," For The Defense, July 1983.

Michael L. Brookshire, "Productivity and Productivity Bargaining," Handbook on Public Personnel Administration and Labor Relations (New York: Marcel Dekker, 1983).

Dennis Brady, Michael L. Brookshire and William E. Cobb, "The Effect of Income Taxes on the Calculation and Presentation of Personal Injury and Wrongful Death Awards," Trial, September 1982, pp. 65-68.

Michael L. Brookshire and Michael D. Rogers, "Productivity and Collective Bargaining in the Public Sector," Labor Law Journal, August 1981.

Michael L. Brookshire, "Labor Relations in Higher Education," management development modular package of the Higher Education Management Institute, 1980.

Michael L. Brookshire and Edwin H. Talley, III, "Management Development and Training in Higher Education—The HEMI Project," Journal of the College and University Personnel Association, Fall 1978.

Michael L. Brookshire, Sidney Carroll, and William E. Cobb, The Large Commercial Jet Airliner Market: Recent Experience and Trends for the Future," NASA Monograph, 1978.

Michael L. Brookshire, "Myths of Collective Bargaining in the Public Sector," Journal of the College and University Personnel Association, Fall 1977.

Michael L. Brookshire, "Centralized Bargaining Structures and Referendum Rights," Southern Business Review, Fall 1976, Vol. 2, No. 2.

Michael L. Brookshire, "Bargaining Structure in the Public Sector: The TVA Model," Journal of Collective Negotiations in the Public Sector, Fall 1976, Vol. 5(3).

4

Michael L. Brookshire and Howard H. Lumsden, "Attitudes Toward Sex and Job Market Mobility and Success," <u>Journal of College Placement</u>, Spring 1975.

Michael L. Brookshire and Sidney Carroll, "Patents and Vertical Integration as a Source of Monopoly Power: The Photographic Industry," <u>Antitrust Law and Economics Review</u>, 1974, Vol. 7, No. 1.

Michael L. Brookshire and Michael D. Rogers, "The Status of Public Sector Labor Relations," <u>Tennessee Survey of Business</u>, April 1974.

Michael L. Brookshire and J. Fred Holly, "Resolving Bargaining Impasses Through Gradual Pressure Strikes," <u>Labor Law Journal</u>, October 1973, Vol. 24, No.10.

**Papers and Professional Presentations and Activities:**

"The Forensic Economics of Punitive Damages," paper presented at the annual meeting of the American Economic Association, Washington, D.C., January 3, 2003.

"New Issues in Punitive Damages from the Defense Perspective," presentation to the annual meeting of the Ohio Association of Civil Trial Attorneys, Columbus, Ohio, September 27, 2002.

"What is New in Economic Damages:  From Medical Monitoring to Punitive Damages to the Eight-Factor Technique," presentation to the annual meeting of the West Virginia Trial Lawyers Association, Charleston, West Virginia, June 6, 2002.

"A History of the National Association of Forensic Economics, 1986-2001," paper presented at the National Association of Forensic Economics Winter Meeting in Cancun, Mexico, February 1, 2002.

Panel Discussant on "Interim Final Rules by Attorney General John Ashcroft" for the Victims Compensation Fund September 11, 2001 Disaster at the National Association of Forensic Economics meeting of the ASSA/AEA held in Atlanta, Georgia on January 4, 2002.

"Determinants of Economic Outcomes from Alternative Methods of Costing Medical Monitoring Protocols," paper presented (with Dr. Dennis C. Emmett) at the annual meeting of the Southern Economic Association, Tampa, Florida, November 17, 2001.

"The Forensic Economics of Medical Monitoring Protocols," paper presented (with George Barrett) at the annual meeting of the Western Economic Association, San Francisco, July 6, 2001.

Session Chair, "Forensic Economics and Children," annual meeting of the Western Economic Association, San Francisco, July 6, 2001.

Discussant of Schneider Paper at the NAFE/ASSA Meetings in New Orleans, Louisiana, January 5-7, 2001.

"Calculating Worklife Expectancy," paper and panel discussion at the annual meeting of the Western Economic Association, Vancouver, June 30, 2000.

"Commercial Damages," presentation at a Lorman Education Services continuing legal education seminar, December 14, 1999, Cincinnati, Ohio.

"A 1999 Survey Study of Forensic Economists – Their Methods and Their Estimates of Forecast Variables," paper presented at the Southern Economic Association meeting, New Orleans, November 21, 1999.

"The Forensic Economist On The Defense," paper presented at the Southern Economic Association meeting, Baltimore, Maryland, November 8, 1998.

"The Forensic Method For Estimating Lost Household Services, With Specific Emphasis On Persons Over 50," paper presented (with Beth Gunderson) at the Western Economic Association Meeting, Lake Tahoe, Nevada, June 30, 1998.

"The Interface Between the Vocational Expert and the Forensic Economist," annual meeting of the American Board of Vocational Experts, New Orleans, Louisiana, March 11, 1998.

"Prevailing Practice in Forensic Economics: a 1996 Survey Study," paper presented (with Frank Slesnick) at the January 1997 meetings of the Allied Social Science Association, New Orleans, Louisiana, January 5, 1997.

"State-of-the-Art Issues on Damages for the Defense Attorney," presentation to the Tennessee Defense Lawyers Association, Fall Convention, in Memphis, Tennessee, September 28, 1996.

"On the Interpretation of Age-Earning Profiles," paper presented (with Robert J. Thornton and James D. Rodgers) at the July 1996 meeting of the Western Economic Association, San Francisco, California, July 1, 1996.

Session Chair, "Methodological Considerations in the Practice of Forensic Economics," annual meeting of the Southern Economic Association, New Orleans, Louisiana, November 20, 1995.

"Principles of Establishing The Lost Earnings Base," paper presented (with Shelly E. Caruthers) at the July 1995 meeting of the Western Economic Association, San Diego, California; also served as continuing education session panelist.

6

"A Comparison of Age-Earnings Profiles from the U.S. Census Bureau and the PSID and Their Use in Forecasting Earnings," paper presented (with Drs. Rodgers and Thornton) at the annual meeting of the American Economic Association, Washington, D.C., January 1995.

Session Chair "The Value of Intangibles," annual meeting of the Southwestern Economic Association, San Antonio, Texas, April 1-3, 1994.

"Survey Questionnaire: Qualifications, Ethics, and Procedures for Forensic Economics Practitioners," paper presented (with Professor John Adams and Professor Frank Slesnick) at June 1993 meetings of the Western Economic Association, Lake Tahoe, Nevada.  Also, facilitated continuing education session in forensic economics.

"The Calculation and Application of Age-Earnings Adjustments," paper presented (with Professor Gilbert L. Mathis) at meeting of the Southern Economic Association, Washington, D.C., November 1992.

National Co-Chair for Annual Meeting of National Association of Forensic Economists with American Economic Association, New Orleans, January 1992.  Also served as session chair.

Session Chair, Southern Economic Association meetings, Nashville, Tennessee, November 1991.

"A 1990 Survey of Forensic Economists," paper presented (with Professor Frank Slesnick) at annual meetings of the National Association of Forensic Economists, with the American Economic Association, Washington, D.C., December 1990; also served as Discussant at these meetings.

"An Agenda for Future Research in Forensic Economics," paper presented at meetings of Southern Economic Association, New Orleans, Louisiana, November 1990.

"The Forensic-Economics Industry: A Survey of NAFE Members," paper presented (with Professor Frank Slesnick and Robert Lessne) at annual meetings of the National Association of Forensic Economists, with the American Economic Association, Atlanta, Georgia, December 1989.

Regularly used as Referee for articles submitted to the quarterly Journal of Forensic Economics, first 1987 issue through present.

"The Role of Economists Versus Other Experts in Assessing Economic Damages," presented at annual meeting of the American Psychological Association, Washington, D.C., August 21, 1986.

"The Vocational-Economic Approach to Assessing Lost Earnings," presented to annual meeting of vocational and rehabilitation experts, Los Angeles, California, April 20, 1986.

"Consumer Expenditure Survey Data and the Estimation of Economic Loss," paper presented at the American Council on Consumer Interests annual conference, Ft. Worth, Texas, March 30, 1985.

"New Issues in Appraising the Value of a Human Life," paper presented (with William E. Cobb) at the annual meeting of the Industrial Relations Research Association and American Economic Association, San Francisco, California, December 1983.

"Problems With The Offset Technique," paper presented at the annual meeting of the Eastern Economic Association, Boston Massachusetts, 1983.

"Management Effectiveness: Productivity Versus Quality," keynote speech for the annual meeting of the Higher Education Management Institute, Williamsburg, Virginia, 1982.

"Productivity and Collective Bargaining in the Public Sector," paper presented at the annual meeting of the Industrial Relations Research Association, Huntington, West Virginia, Spring 1981.

Panelist and Program Chairman, "Public Sector Collective Bargaining," Annual Meeting of the Industrial Relations Research Association of West Virginia, 1976.

Panel Member, Annual Meeting of the Southern Economic Association, 1973 and 1974.

## Experience:

### 1975-Present

President, Michael L. Brookshire and Associates.  Work for plaintiff and defense attorneys in many states, various federal and state agencies, and other clients:  analyses of various categories of economic damages to individuals or classes of individuals, and expert testimony, in wrongful death, personal injury, commercial, antitrust, employment-law cases, intellectual property, medical monitoring protocol, and punitive damages cases.  Conduct research and publish in these applications of economics to the law and have conducted "Proof of Damages" seminars (through Colleges of Law, Bar and Trial Attorney groups, and other associations) in the following cities: Charleston and Huntington, West Virginia; Louisville and Covington, Kentucky; Roanoke, Virginia; Cincinnati, Columbus, Dayton, Toledo, and Cleveland, Ohio; Indianapolis, Indiana; Knoxville, Chattanooga, Nashville, Memphis and Tri-Cities, Tennessee; Atlanta; Los Angeles; Boston; Chicago; Miami; Pittsburgh; Tampa; Washington, D.C.; Hilton Head, South Carolina; and Portland, Maine.  Served as economist in several mass disaster and class action cases, for both plaintiff and defense counsel, including Arrow Air crash (Gander, Newfoundland), Bendectin class action, Louisville Sewer Explosion, and Pan Am (Lockerbie) crash and Fen-Phen class action cases; facilitate strategic planning, executive team building, and training activities (as described later).

### June 1983-Present

Professor of Management and Economics for the Marshall University Graduate College, Charleston, West Virginia; responsible for graduate programs in industrial relations; teach and conduct research as a tenured, full professor.

### August 1981-June 1983

Acting Vice President for Business Affairs for the University of Cincinnati: responsible for departments of physical plant; capital planning and construction; bookstores, parking, transportation, communications, and other auxiliary services; public safety; U.C. Computer Center; and purchasing services provided to all campuses and complex Medical Center with two teaching hospitals. Direct responsibility for $48 million operating budget. Coordinated effort for $85 million State appropriation for capital improvements, and subsequently the largest capital construction program in University history. Liaison with numerous State departments and officials and staff to several committees of Board of Trustees. Testified before key committees of State Legislature. Also, continued duties and responsibilities described immediately below.

### March 1981-June 1983

Named as youngest officer in 162-year history of University of Cincinnati: Executive Director of University Personnel and Associate Professor of Management; responsible for University-wide human resource management program for main campus, comprehensive medical center, two satellite campuses, and two teaching hospitals. Reported directly to the President and served as cabinet officer and officer of the Board of Trustees. Responsible for personnel policies, organization development, training, compensation, benefits, employment, records, and data systems. Also responsible for employee and labor relations, with negotiations and contract administration in several bargaining units. Performed other special assignments for the President, such as chairing University-wide committee on Organization Development. Held rank as Associate Professor of Management in the College of Business Administration.

### 1980-1981

Associate Vice President for Business and Finance of the state-wide University of Tennessee System: continued duties and responsibilities of Assistant Vice President position, with added responsibilities in coordinating the utilization of data processing systems by all types of University users, in implementing management improvement systems, and in human resource and financial planning.

### 1978-1980

Assistant Vice President for Business and Finance and Chief Personnel Officer of the state-wide University of Tennessee System: advice and guidance to the Vice President for Business and Finance, other Vice Presidents and Chancellors, and the President on policies and programs in human resource management and development; supervised activities of Office of Personnel Services in a range of University-wide wage administration, salary administration,

benefits, employment, automated data systems, affirmative action, employee relations, and other programs; chaired meetings of Chief Personnel Officers and participated in meetings of Chief Business Officers; served as University Employee Relations Officer and Assistant Affirmative Action Officer; supervised work of University Employee Relations Officer and Assistant Affirmative Action Officer; supervised work of University Human Resource Development Officer in the coordination of University training and development programs; worked with academic affairs staff in the design of training systems and in the training of campus trainers and served as a management trainer for top-level academic and non-academic staff members; served as coordinator of campus/unit task forces in the management development and training program of the Higher Education Management Institute (HEMI); chairman of the Advisory Board for the HEMI Program Center for 4-year colleges and universities and served as Program Center Associate; supervised work of various consultants in human resource management, development, and training; supervised activities of Office of Retirement Services in the coordination of retirement policies and programs; supervised the activities of the University Graphic Arts Service and of the University Office of Transportation Services; assisted the Vice President for Business and Finance in budget, fiscal, and other administrative areas; for example, performed studies of fiscal liabilities associated with major grants and contracts, chair the project team and task force developing a Human Resource Information System; served in a liaison role for University with several offices of state government; re-designed and implemented University goal setting, performance review, and other management processes for the President; responsible for University preparation for collective bargaining and union-management relations and coordinated these efforts with state government.

### 1976-1978

Director of Personnel Services for the state-wide University of Tennessee System: coordinated all personnel policies and programs for five campuses, four additional administrative units, and 18,000 clerical, supporting, executive, administrative, professional and student employees; specific assistance provided to Business and Personnel Officers on the campuses in the areas of recruitment, placement, employee relations, job analysis, wage and salary administration, faculty and staff development and training, staff benefits and services, wage and hour law, EEO, affirmative action, and safety; served as University Employee Relations Officer, Assistant Affirmative Action Officer, and Project Coordinator in a three-year project of the Higher Education Management Institute to develop management development and training programs in institutions of higher education; policy advice, guidance, and assistance rendered to the President, Executive Vice President, Vice President for Business and Finance of the University, and to Chief Administrative Officers of campuses; provided advice on legislative relations in human resource management; coordinated work of Hay Associates, Higher Education Management Institute, and other consultants, and of staff personnel in University-wide operational functions of wage and salary administration, unemployment claims, workers' compensation, liability insurance, benefits, and training; performed consultative studies of campus departmental operations upon request; directly supervised a staff of professional and supporting personnel.

### 1975-1976

Assistant Professor of Industrial Relations:  West Virginia College of Graduate Studies; Charleston, West Virginia; responsible for graduate courses in compensation administration, personnel management, public and private sector collective bargaining, arbitration, labor history, labor law, and the economics of human resources.

### 1973-1975

Lecturer: University of Tennessee, Knoxville day and evening school courses: taught courses in Introductory Economics, Labor Economics, and Industrial Organization; also engaged in consulting and professional public speaking activities.

### 1971-1973

NDEA Title IV Graduate Fellow.

### 1970-1971

Assistant to Director, University of Tennessee, Knoxville Department of Alumni Affairs; involved in many public relations and communications activities.

### National Offices, Other Professional Activities, and Honorary Memberships

1999 Recipient of Past President's Award for Outstanding Service to the National Association of Forensic Economics.

American Economic and Allied Social Science Association; one of five committee members chosen to recommend how Annual meeting allocation time is re-assigned to specialty groups within the Allied Social Science Association, 1999-2002.

Marshall University Lewis College of Business, Ashland Oil Foundation, "Outstanding Researcher Award," May 1998.

National Association of Forensic Economics: Executive Director for three-year term, 1999-2001; Associate Editor of Journal of Forensic Economics and Litigation Economics Digest, 1997-1999; Past President and ex officio member of Board of Directors, 1995-1998; President, 1993-1994; President-elect, 1992; Vice President or member of Board of Directors, 1990-2001; charter member and referee for articles submitted to Journal of Forensic Economics; co-chair of 1992 annual meeting in New Orleans, Louisiana as part of annual meetings of the American Economic Association; member of Board of Director's committees on qualifications and ethics and on continuing education; as past president, served as liaison to American Bar Association, trial lawyers' associations, and other legal groups; co-chair of 1997 committee on the review of Constitution and By-laws.

11

Consultant, professional trainer, and speaker for colleges; legal, medical, and dental associations; and other organizations on such topics as team building, strategic planning, empowerment, labor relations, the economics of the law, practice management, the management process, time management, motivation, problem solving, and productivity improvement. Consulting clients include the West Virginia Coal Mining and Reclamation Association, International Industries, Inc., the Southern West Virginia Community and Technical College, the West Virginia Medical Institute, the Board of Regents for the University of Florida higher education system, the Union Carbide Corporation, Columbia Gas Corporation, Financial Bankshares, Inc., the University of Louisville, the Oak Ridge Associated Universities, the Higher Education Management Institute, the Piedmont Community College District, the Data Processing Managers Association, the College and University Personnel Association, FMC, the nation-wide Scripps-Howard Newspaper Editors, the West Virginia Rehabilitation Agency, the Ohio Masonic Home, Inc, the Southern West Virginia Community and Technical College, and Internal Auditors and other business groups.

Consultant to the Charleston Area Medical Center in development of 18 modular training packages and comprehensive management development and training system, 1987-1989. Consultant in team building process for CEO and other executives, 1989-1999; consultant to managed care subsidiary Carelink in team building and strategic planning; facilitator for integration of physicians into the administration of Medical Center, and for healthcare network issues in West Virginia.

Executive Board Member, West Virginia Chapter of the Industrial Relations Research Association, Mountain State Economic Association, Western Economic Association, Industrial and Labor Relations Research Association, College and University Personnel Association, and Tennessee Valley Personnel Association.

Certified Trainer in the Model-NETICS management development program of Main Even Management, Incorporated.

Outstanding Young Man of America, 1980.

National Co-Chairman, 1979-80 Council of Participating Institutions in the Higher Education Management Institute program of the American Council of Education.

Member, Knoxville Rotary Club and Chairman of Interact Committee, 1976-1980.

Vice President (1979) and President (1980) of Volunteer Knoxville, Inc., an organization which coordinates volunteer activities in Knoxville, Tennessee.

Member, Personnel Committee of Board of Directors of Greater Knoxville YMCA, 1979-1980.

Co-Chairman of Fund Raising Campaign for Greater Knoxville Junior Achievement Program in 1979.

12

Secretary/Treasurer, Tennessee Industrial Relations Research Association, 1977-78.

Project Analyst for 1975-76 NASA grant and Consultant for 1976-77 grant (contract NSP 7089) entitled "Benefit-Cost Analysis and the OAST New Initiative Cycle": Worked with the Project Director in examining the methods used by the Office of Aeronautics and Space Technology of NASA to evaluate proposals for new systems technology and experimental projects; specifically concerned with a study involving personnel at various NASA research centers and at OAST headquarters in Washington, with evaluation of benefit/cost techniques, with a study of the airframe industry, and with the application of economics to the value of human life.

Member of the General Council and of the National Scholarship Committee of Omicron Delta Kappa, honorary leadership society for University student, faculty, and staff leaders, 1973-76.

Outstanding Graduate Student award, University of Tennessee, Knoxville, 1975.



MOTOR CARRIER SAFETY * HIGHWAY COLLISION RESEARCH

WASHINGTON, D.C.

**STOPPER**

**& ASSOCIATES**

December 09, 2003

RECEIVED

DEC    2003

INITIAL:

R. Edison Hill
Hill Peterson Law Firm
500 Tracy Way
Charleston, WV  25311
304-345-5667    Fax 304-345-1519

Re:  Fatality – Multi Vehicle Collision
I-64 Westbound, 17 mile marker, Cabell County, WV
Estate of Joseph Abramson

Dear Mr. Hill:

At your request, the following represents an update since our last meeting and my findings to date for the referenced traffic fatality.  These opinions are very preliminary as investigation and discovery is continuing but is offered within a reasonable degree of professional and scientific certainty.

- The primary cause of this collision was failure of the operator of a truck tractor and semi trailer, David B. Small, to operate at an appropriate and lawful speed while driving westbound on I-64.
- This truck tractor and semi trailer was found to owned by RBL Leasing Corp. of Franconia, PA
- This truck tractor and semi trailer was operated under Federal Motor Carrier Safety Administration (FMCSA) interstate operating authority USDOT#473902 under the motor carrier Laneko Manufacturing Company, Royersford, PA. 19468.
- According to official public records of the FMCSA, this motor carrier is found to be listed as "Deficient" in Driver Safety Evaluation Area primarily as a result of drivers declared "out of service" for driver hours of service violations.
- Examination of the scene and interview with WV State Police reveal traffic was slowing and/or stopped due to a lane closure ahead on I-64.
- Examination of the scene revealed the operator of a truck tractor and semi trailer would have at least ¼ mile of clear visibility of the slowing traffic with more than ample time and distance to reduce his speed to avoid a collision.

6200 EVERGREEN MOUNTAIN ROAD, BROAD RUN, VIRGINIA 20137-1907*(540) 347-0702* 540-347-0763
Office E-Mail: StopperTrucks@aol.com   Mobile E-Mail: StopperBus@aol..com

Re: Fatality – Multi Vehicle Collision
I-64 Westbound, 17 mile marker, Cabell County, WV
Estate of Joseph Abramson
December 9, 2003
Page 2 of 2

- The physical evidence indicates the truck tractor and semi trailer was being operated recklessly and at a seriously excessive speed at the onset of braking. Initial speed estimates at the onset of braking place the speed of the truck tractor and semi trailer operated by Mr. Small for Laneko Manufacturing Company well in excess of 80 mph and most likely at or above 90 mph.
- The Federal Motor Carrier Safety Regulations (FMCSR) defines reckless driving and operating at speeds in excess of 15 mph over the speed limit as "Serious Traffic Violation".
- Examination of the semi trailer revealed defects in the brake system which would have the effect of increasing impact speed after the onset of braking.
- Examination of the scene, review of police reports, police photographs and interview with WV State Police reveal Mr. Abramson was trapped in his 1998 Mercury after being struck and pushed into other vehicles by the RBL / Laneko Manufacturing Company truck tractor and semi trailer.
- Examination of the 1998 Mercury, review of police reports, police photographs interview with WV State Police and medical examiner's reports indicate Mr. Abramson survived the initial crash but was trapped in the vehicle and died as a result of the severe fire after the vehicles had come to rest.
- At this time, I have found no causative or contributing factors by the other vehicles which were struck as the RBL / Laneko Manufacturing Company crashed through the traffic.

Again, I must emphasize these opinions are preliminary. I expect to add to as well as may be offering additional opinions as the investigation and discovery reveals more information.


Sincerely,


David A. Stopper
Director

FASHION LASHER SAFETY HIGHWAY COLLISION RESEARCH
5300 EVERGREEN MOUNTAIN ROAD, BROAD RUN, VA 20137

# CURRICULUM VITAE
# DAVID A. STOPPER

DIRECTOR
Stopper & Associates
Motor Carrier Safety - Highway Collision Research
6200 Evergreen Mountain Road
Broad Run, Virginia 20137-1907
(540) 347-0702

LEAD INSTRUCTOR (1989-2001)
Commercial Vehicle Accident Reconstruction Program
Texas A & M University System, TEEX
Texas Engineering Extension Service
Riverside Campus, College Station, Texas

## AREAS OF SPECIALIZED EXPERTISE

Originally developed skills and training in commercial vehicles and accident investigation/reconstruction during his 17-year law enforcement career in Fairfax County, Virginia (the largest municipal law enforcement agency in Virginia). The majority of his career was spent in traffic and truck enforcement with his last two years on the police academy staff in charge of all traffic, motor carrier safety, and accident investigation training. His duties included response to major motor vehicle and truck accidents with the newly formed Motor Carrier Safety Team and Accident Reconstruction Units.

Developed several courses instructing senior and recruit law enforcement officers which prompted local motor carriers to solicit his expertise in developing training programs for the trucking industry through the Northern Virginia Community College. In 1986 he was invited by the University of North Florida's Institute of Police Technology and Management to join its adjunct staff to develop and instruct for its Commercial Vehicle Inspection/Accident Investigation courses. These courses were taught nationally as well as on campus in Jacksonville, Florida. In 1989 Mr. Stopper was asked to become an adjunct instructor at Texas A&M University (TEEX), where he continued as staff instructor through 2001, to teach the classes he developed to law enforcement officials, engineers, and investigators from both national and international agencies.

Mr. Stopper holds a commercial driver's license for all classes of commercial motor vehicles and has conducted hundreds of truck and bus vehicle tests including vehicle dynamics, emergency braking dynamics, air brake vehicle systems, and crash experiments. He has taught commercial vehicle drivers safety courses and conducted hundreds of investigations and reconstructions involving trucks and buses. Stopper & Associates, Motor Carrier Safety/Highway Collision Research, was established in 1986 to facilitate teaching, safety consulting, research, and accident reconstruction projects and services.

## EXPERIENCE

- 1989-2001* Lead Instructor/Course Director, Commercial Vehicle Accident Investigation/Reconstruction Level I and Level II, Texas Engineering Extension Service, Riverside Campus, Texas A&M, College Station, Texas. *(continuing to lecture periodically on the subject).

- 1986-1987 RADAR Instructor at University of North Florida, adjunct staff.

- 1986-1989 Commercial Vehicle Inspection and Commercial Vehicle Accident Reconstruction Instructor at University of North Florida, adjunct staff.

- 1979-1988 Instructed Advanced Accident Investigation, Accident Reconstruction and Radar instructor courses, Northern Virginia Criminal Justice Academy.

- 1985-1998 Adult Education Instructor/Motor Carrier Driver Safety, Northern Virginia Community College, Institute for Heavy Truck and Transportation Safety. Appointed Program Director in January 1988.

- 1985-1987 Academy Staff and Instructor, Fairfax County Public Safety Academy, Lead Instructor for Traffic Enforcement, Accident Investigation. Advanced Accident Investigation and Motor Carrier Safety Investigation courses (Police and Sheriff's Academy).

- 1983-1984 Crime Prevention Office and part-time police academy instructor.

- 1982-1983 Master Police Officer, assigned to McLean District as Field Training Officer, district Accident Investigation Unit. Assisted in the development of the full-time Accident Reconstruction Team and Motor Carrier Safety Unit. Worked to draft and present state legislation to authorize the Fairfax County Motor Carrier Safety Unit.

- 1973-1982 Appointed as Police Officer, Fairfax County, Virginia. Various assignments included Traffic and Truck Enforcement/Accident Investigation and Motor Carrier Safety/Truck Weight Enforcement.

- 1971-1973 Police Cadet, Fairfax County, Virginia. Various assignments included Traffic Safety, and evidence technician.

2

## PROFESSIONAL TRAINING

- Northern Virginia Police Academy (1973)
- Accident Investigator Unit Course, Northern Virginia Police Academy (1975)
- Scuba Diving, N.A.U.I. (1976)
- Advanced Scuba Diving, N.A.U.I. (1976)
- Scuba, Underwater Search and Recovery, N.A.S.D.S. (1976)
- Advanced Accident Investigation, Virginia Commonwealth University (based on Northwestern Traffic Institute's course presented at Northern Virginia Police Academy) (1976)
- Moving RADAR Seminar, Kustom Electronics (1976)
- Moving RADAR Seminar, M.P.H. Industries (1979)
- RADAR Instructor Course, Virginia Military Institute, Department of Electrical Engineering, Lexington, Virginia (1980)
- Field Training Officer, Northern Virginia Criminal Justice Academy (1980)
- Advanced Accident Investigation, Northern Virginia Criminal Justice Academy (1980)
- RADAR Speed Measurement Seminar, Northern Virginia Criminal Justice Academy (1982)
- Crisis Management, Level I, Northern Virginia Criminal Justice Academy, James Ahrens and Associates (1983)
- Narcotics and Dangerous Drug Law Enforcement, Drug Enforcement Administration, Washington, D.C. (1984)
- Accident Reconstruction Certification Course, Institute of Police Technology and Management, University of North Florida at Fairfax, Virginia (1985)
- Motor Carrier-Vehicle Inspection Course, U.S.D.O.T. Bureau of Motor Carrier Safety (1985)
- Environmental Design for Crime Prevention, Virginia Crime Prevention Association (1985)
- Traffic Homicide Investigations, Institute of Police Technology and Management, University of North Florida (1986)
- Advanced Traffic Accident Investigation, Institute of Police Technology and Management, University of North Florida (1986)
- Motor Carrier-Vehicle Inspector Recertification Course, U.S.D.O.T. Bureau of Motor Carrier Safety at Fairfax County (1986)
- Motor Carrier-Vehicle Inspection Instructor, U.S.D.O.T. Bureau of Motor Carrier Safety at the Virginia State Police Academy (1986)
- Investigation of Commercial Accident, Institute of Police Technology and Management, University of North Florida (1986 & 1987)
- Accident Reconstruction (Special Problems - Auto Anti-Lock Brakes - Truck Brakes), Regional Police Academy, Passaic, New Jersey (1986)
- Commercial Vehicle Accident Investigation, Institute of Police Technology and Management, University of North Florida (1987)
- Truck Air Brake School, Rockwell International at Fairfax County Public Safety Academy (1987)
- Special Problems in Accident Reconstruction Institute of Police Technology and Management, University of North Florida (1987)
- Transmission Failure Analysis/Maintenance, Eaton Corporation, Charlotte, North Carolina  (1987)
- Hazardous Materials Course, National Fire Academy (1987)

- Hazardous Materials Pesticide Challenge, National Fire Academy (1987)
- Traffic Commanders Conference, Monmouth County Police Academy, NJ, (1987)
- Training, Licensure, and Monitoring of Drivers of Large Trucks, 20th Annual Workshop, Human Factors in Transportation, Transportation Research Board (1987)
- Traffic Safety Conference, The University of Kansas and Kansas Department of Transportation, Office of Traffic Safety (1987)
- Special Problems in Accident Reconstruction Institute of Police Technology & Management, University of North Florida (1988)
- Tow Truck Driver Training Program, Towing and Recovery Association of America, Inc. (1988)
- Special Problems in Traffic Accident Reconstruction, Institute of Police Technology & Management, University of North Florida, Jacksonville, FL (1988)
- Virginia Division of Motor Vehicles Driver Improvement Instructor Certification (1989) at Northern Virginia Community College (National Safety Council Member)
- Commercial Vehicle Accident Reconstruction Investigators Seminar, National Transportation Safety Board, San Antonio, Texas (1991)
- AAA Driver Improvement Program Instructor's Course, Master Instructor Leader Certification Course (1993)
- National Transportation Safety Board sponsored Computer Aided Drafting for Accident Reconstruction, Arlington, Texas (1993)
- Sokkia's MAP and CONTOUR software for Traffic Highway Research and Investigation (1994)
- Collision Dynamics: Issues and Answers Seminar, Louisville, Kentucky (1994)
- NASA Tire/Runway Friction Workshop at NASA's Wallops Flight Facility, Wallops Island, Virginia (1994)
- National Transportation Safety Board Investigative Conference: "Mobile Collision Warning Technology for Low Visibility/Low Awareness Conditions," Arlington, Virginia (1995)
- NASA Tire/Runway Friction Workshop at NASA's Wallops Flight Facility, Wallops Island, Virginia (1995)
- NASA Tire/Runway Friction Workshop at NASA's Wallops Flight Facility, Wallops Island, Virginia (1997)
- TAARS, SOAR, WATAI Combined Conference: Truck air brakes, truck/car crash tests, forensic use of professional "Total Station" survey equipment (1993)
- TAARS, SOAR, WATAI Combined Conference: Truck air brakes, truck rollovers and truck/car crash tests (1994)
- Commercial Vehicle Accident Conference, Pittsburgh, Pennsylvania, presented by the Pennsylvania Department of Education's Traffic Institute for Police Services, PENNDOT's Highway Safety & Traffic Engineering, U.S. DOT's Office of Motor Carriers, NTSB (1995)
- 1997 - T.A.A.R.S-S.O.A.R.-W.A.T.A.I. Combined Conference, College Station, Texas
- 1997 - Conference on Reconstruction Safety on the Highway, Texas A&M University
- 1997 - Rec-Tec, Advanced Accident Reconstruction Seminar, Cocoa Beach, Florida
- 1998 - Special Problems in Accident Reconstruction of Commercial Vehicles in Collisions, Pennsylvania Traffic Institute for Police Services, State College, Pennsylvania
- 1999 - Master Driver Course, Bill Scott Raceway (BSR, Inc.), Summit Point, West Virginia
- 1999 – Commercial Vehicle Collision Reconstruction, sponsored by NATARI, MATAI, NAPRS, NJAAR, NYSTAIS, October 6-8, 1999, Allentown, Pennsylvania

4

- 2001 – Performance Based Brake Testing at Radlinski & Associates, East Liberty, Ohio
- Land Rover Driving School, 4x4 Instruction, March 7, 2003
- 2003 – International Association of Accident Reconstruction Specialists, Kansas City, Kansas, July 7-11, 2003

- 2003 – Rec-Tec & SMACK Reconstruction Analysis Software Training Seminar, New Orleans, Louisiana, September 2003
- 2003 – Sokkia Forensic Mapping Course, Sokkia North American Headquarters, Olthe, Kansas, October 2003

### PROFESSIONAL AFFILIATIONS

- Southwestern Association of Technical Accident Investigators
- Associate Membership in the Maintenance Council (TMC)/American Trucking Associations, Inc.
- Texas Association of Accident Reconstruction Specialists (TAARS)
- The National Association of Professional Accident Reconstruction Specialists, Inc.
- Society for Automotive Engineers
- Professional Society of Forensic Mapping
- Commercial Vehicle Safety Alliance (CVSA) Member and Sponsor
- California Association of Accident Reconstruction Specialists
- American Society for Testing & Materials (ASTM)
- S.C.A.R.S. (South Carolina Association of Reconstruction Specialists)

### AWARDS/RECOGNITIONS

- 1978 - Worked directly with the National Highway Traffic Safety Administration in creation of the first national traffic RADAR training and equipment standards. First instructor in the United States to utilize this training program while still in draft form to improve the proper use of traffic RADAR for enforcement purposes.
- 1981 - Received Fairfax County Police Department Certificate of Appreciation for the qualities and dedication that reflect the highest traditions of police service presented for contributions assisting other officers in serious and fatal accident investigations, training and numerous successful prosecutions.
- 1981 - Award-winning Eastern Regional Motorcycle Competition rider and instructor (over 160,000 miles of motorcycle operations).
- 1984 - Member of the award-winning Crime Prevention Unit of the Year (Fairfax County Police Department) in the award category for service population over 500,000 awarded by the International Society of Crime Prevention Practitioners.
- 1985 - Received The Fairfax County School Board's Excellentiae Gratia for his chairmanship of the Fairfax County Washington Regional Alcohol Program Committee, which managed one of the nation's first "Project Graduation" programs to twenty-three county high schools. He was commended, "in the last two years since Project Graduation has been in operation, for the first time in 15 years there has not been a single serious accident, injury, or death related to student drinking and driving during the prom and graduation season."
- 1985 - Received William A. Hazel Resource Institute Certificate of Recognition for "contribution in furthering the concepts of education, training, and safety within the William A. Hazel and Tri County Asphalt Companies."

5

- Prepared and presented to the Virginia Highway Commission a proposal to extend DOT/ Motor Carrier inspector authority to County police officers. This resulted in the 1985 amendment to the Virginia State law, which mandated that authority (Virginia Code §46.1-279.01(C)).
- 1986 - Initiated and drafted a change in the Virginia Code through the Honorable Delegate James F. Almand (47th District), with the support of the American Automobile Association, which required minimum standards for training of RADAR operators and the equipment utilized for enforcement purposes. This was adopted under House Bill 627, January 31, 1986, with subsequent changes to Virginia Code § 2.1-446 (radar equipment standards) and § 46.1-198(e) (training of operators and use of proper RADAR equipment).
- 1987 - Received Fairfax County, Virginia Public Safety Academy Certificate of Appreciation with the "whose generous contributions on behalf of this Academy have strengthened and enhanced the standards of progressive public safety training in the Commonwealth of Virginia" (Presented on the occasion of leaving county service.)
- 1975 - Licensed to operate heavy trucks, tractor trailers, and buses. Holds a current Commercial Driver's License.
- 1986, 1987 - Certified as a qualified Law Enforcement Instructor by the Virginia Department of Criminal Justice Services.
- Trained in video production techniques. Has produced and been featured in several training videos, television specials, and news interviews involving traffic safety issues.
- 1992 - Worked with the National Transportation Safety Board during the development and testing of new techniques for estimating the braking ability of air braked vehicles. Conducted and supervised hundreds of heavy truck braking and vehicle dynamics tests (1992 Heavy Vehicle Brake Study).
- 1994 - Guest speaker at The Insurance Institute for Highway Safety. Conducted highway friction testing at its Test Facility, Charlottesville, Virginia.
- Commercial Vehicle Accident Investigation & Reconstruction, Level I & II, Texas A & M University, 1989-2001.

## LECTURES AND PRESENTATIONS (PARTIAL LISTING)

- "Performance Based Brake Tests (PBBT), Considering Air Brake Adjustment Analysis, Weight & Push Rod Stroke Relative to Predicting Brake Force in Collision Reconstruction," IAARS Conference, Kansas City, KS, July 2003.
- Advanced Commercial Motor Vehicle Collision Reconstruction, Missouri & Kansas Hwy Patrol Crash Teams; MO Highway Patrol Academy, Jefferson City, MO  December, 2002
- Advances in CMV Air Brake Systems & Demonstration / Testing of PBBT Performance Based Brake Tester.  South Carolina Accident Reconstruction Specialists, Charleston, SC  June, 2002
- "Reconstruction of Fatal Bus Crash, Air Brake Failure, Rollover, and DOT Safety Regulations Issues," RMITS Conference, University of Colorado, May 2002.
- World Reconstruction Exposition 2000 (WREX2000), September 24-29, 2000, College Station, TX
- ABC 20/20 "Driver Beware-Falling Truckloads a Highway Danger"; Airdates 2/11/00 and 8/17/00.
- Commercial Motor Vehicle Collision Reconstruction:  Topics-1) Friction, Acceleration, Deceleration & Braking of Heavy Air Braked Vehicles; 2) Drivers Hours of Service & Fatigue Study, 1999 Annual Joint Conference (NATARI, NAPARS, et al.), Allentown,

6

Pennsylvania, 1999.

- Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, Mesquite, Texas, September 1999.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Mesquite, Texas, August 1999.
- Commercial Vehicle Inspection/Accident Investigation, Forsythe, Georgia, June 1999.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Texas Engineering Extension Service, Texas A & M University, College Station, Texas, April 1999.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Cincinnati, Ohio, April 1999.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, Houston Regional Training Center, February 1999.
- Conference on Reconstruction and Safety on the Highway, 1998, Texas A & M University, College Station, Texas, 1998.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, San Diego, California, September 1998.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Texas Engineering Extension Service, Texas A & M University, College Station, Texas, April 1998.
- Investigated, reconstructed for Indiana State Prosecutor's Office, and assisted ABC's 20/20 in related segment on fatal bus accidents, "The Serious Safety Problems of Some Charter Buses," Air date December 18, 1997.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Helena, Montana, November 1997.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Texas Engineering Extension Service, Texas A & M University, College Station, Texas, 4/97.
- Commercial Vehicle Inspection/Accident Investigation, Houston, Texas, March 1997.
- Crash '97, Conference on Reconstruction and Safety on the Highway 1997, Texas A & M University.
- Continuing Changes in the Commercial Vehicle Safety Environment, Heavy Construction Contractors Association, Virginia, 1996.
- Commercial Vehicle Rollover, Commercial Vehicle Accident Investigation, Pittsburgh, Pennsylvania, December 1996.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Michigan State Police, September 1996.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Texas Engineering Extension Service, Texas A & M University, College Station, Texas, August 1996.
- Commercial Vehicle Inspection/Accident Investigation, Level I & II, South Carolina Highway Patrol, May 1996.
- Commercial Vehicle Inspection/Accident Investigation, Springdale, Arkansas, June 1996.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, March 1996.
- Commercial Vehicle Inspection/Accident Investigation, Denton, Texas, December 1995.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Jefferson Community College, Louisville, Kentucky, July 1995.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Texas Engineering Extension Service, Texas A & M University, College Station, Texas, August 1995.

7

- Truck Brake Systems and Failure Analysis, Pennsylvania Traffic Institute for Police Services, USDOT/OMCS, NTSB, Pittsburgh, Pennsylvania, 1995.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, May 1995.
- Accident Reconstruction, State Bar of Texas, Preparing, Trying, and Settling Auto Collision Cases Seminar, 1995.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, February 1995.
- "Conspicuity", Iowa Association of Legal Assistants Seminar, 1994.
- Advanced Commercial Vehicle Accident Investigation, Texas Engineering Extension Service, Texas A & M University, College Station, Texas, September 1994.
- Demonstrative Evidence Seminar, Maryland Trial Lawyers Association, 1994.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, March 1994.
- Commercial Fleet Safety Management/DOT Compliance, Virginia, 1993.
- Advanced Commercial Vehicle Accident Investigation & Reconstruction, Texas Engineering Extension Service, Texas A & M University, College Station, Texas, August 1993.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, May 1993.
- Transportation Safety & Commercial Vehicles, Philadelphia Trial Lawyers Assn., 1992.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, October 1992.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, December 1991.
- Commercial Vehicle Inspection/Accident Investigation, Texas Engineering Extension Service, Texas A & M University, August 1990.
- Commercial Vehicle Inspection, Media, Pennsylvania, June 1989.
- Commercial Vehicle Investigation & Inspection, Needham, Massachusetts, June 1988.
- Inspection and Investigation of Commercial Vehicles in Accidents, IPTM, University of North Florida, April 1988.
- Vehicle Inspection; The Martin-Brower Company, Transportation Quarterly Safety Meeting, 1988.
- Aspects of Truck Braking in Accident Investigation & Reconstruction, National Association of Traffic Accident Reconstructionists and Investigators, 1988.
- Investigating Commercial Vehicle Wrecks, Accident Reconstruction Conference, Normal, Illinois, 1988.
- "Federal Regulations and Drivers Logs for Large Trucks," Institute of Police Technology and Management, 1988
- Special Problems in Traffic Accident Reconstruction Conference, Florida, 1988.
- Inspection of Commercial Vehicle Accidents, IPTM, University of North Florida, August 1988.
- Commercial Vehicle Accident Investigation, IPTM, University of North Florida, February 1988.
- Commercial Vehicle Accident Investigation, IPTM, University of North Florida, August 1987.
- Certified Master driver improvement Instructor, American Automobile Association, 1986

James A. Kaplan, M.D.
Chief Medical Examiner

Zia Sabet, M.D.
Deputy Chief Medical Examiner

Hamada Mahmoud, M.D.
Deputy Chief Medical Examiner

James Kraner, Ph.D.
Chief Toxicologist



**STATE OF WEST VIRGINIA**
**DEPARTMENT OF HEALTH AND HUMAN RESOURCES**
**OFFICE OF THE CHIEF MEDICAL EXAMINER**

619 Virginia Street West
Charleston, WV 25302
Phone (304) 558-3920
FAX  (304) 558-7886

BOB WISE
Governor

## AUTOPSY REPORT

### CASE NO:  WV 2003-557

**ABRAMSON, Joseph**

Date of Birth:  October 12, 1946   AGE:  56 years

Date of Death:  July 14, 2003
Date of Pronouncement:  July 14, 2003 @ 4:20 p.m.
Body Received at OCME:  July 15, 2003 @ 8:15 a.m.
Date of Examination:  July 15, 2003
Examination Commenced:  3:00 p.m.

Autopsy performed by:

**Zia Sabet, M.D.**
**Deputy Chief Medical Examiner**

Autopsy performed at:

**Office of the Chief Medical Examiner**
**701 Jefferson Road**
**South Charleston, WV  25309**

Investigators:

C. Payne, Cabell County ME
Off. Bellomy, Barbousville Police Dept.
R. Reynolds, OCME

ABRAMSON, Joseph
WV 2003-557

PAGE 2

## EXTERNAL EXAMINATION

**GENERAL APPEARANCE:** The body is that of a markedly burned, charred and fire amputated white male with fire destruction which is 100% of the total body surface area with fire penetration of the right thoracic and abdominal cavities. Body length in its present state is 5' 6" and weight of 205 lbs. The severe body charring and fire destruction eliminates visual recognition for identification purposes. There is extensive fire destruction of the scalp of the calvarium with absence of hair and skin scalp. No skull fracture is seen. Extensive charring to the level of bone and within is noted of the facial skeleton with extension of fire destruction to the posterior orbit regions which do contain bilateral cooked globes of the eyes. The total external nose shows charring penetration to the level of the choanae. The tongue is cooked and charred. The neck shows charring to the level of skin and subcutaneous tissue but not penetrating to the trachea or larynx. No other external trauma of these structures is noted. There is marked fire destruction of right lower rib cage, as well as right lateral upper abdomen with fire loss of right upper abdominal wall and exposure of right lower lung and liver. The external genitalia are cooked, however there is definitely penile root structure which is circumcised. There is fire amputation of upper right fingers and left hand. Skin slippages with muscle exposure are noted on the lower extremities. No recovered jewelry is noted. The charred remnants of clothing includes a piece of blue jean pants with braided belt and yellow metal buckle, underwear shirt and shorts, multi-colored shirt, socks and shoes. Two sets of melted keys are attached to the right flank. A black wallet is noted within the pocket of the right remnants of pants which contains Marshall University identification card, SAMS card with a picture, social security card with personal papers, credit cards (including two Master Cards, two VISA cards, a Discover card), driver's license with money clip of $142.00. A pocket knife also is noted next to the body. $1.70 of US coins were found around the lower extremities.

## INTERNAL EXAMINATION

**BODY CAVITIES:** The thoracoabdominal incision is used to examine the viscera. Bilateral anterior and posterior rib fractures extending from 2nd to the 11th ribs are noted. Minimal free non-clotted blood is noted within the right and left chest cavity. The pericardial sac is unremarkable. The abdominal cavity contains an estimated 200 ml. of clotted and non-clotted blood.

**HEAD:** The posterior intermastoid removal of the calvarium used to examine the brain. No skull fracture is seen. There is a large subdural hemorrhage over the entire brain of clotted and cooked blood. There is mild subarachnoid hemorrhage over the right and left hemisphere. The brain weighs 1,350 grams and shows acute congestion and cooked parenchyma with absence of old or recent injury. Circle of Willis is unremarkable. Base of the skull is without note.

**ABRAMSON, Joseph**
**WV 2003-557**                                                    **PAGE** 3

**NECK ORGANS:**  Unremarkable.  No soft tissue injury is noted of the neck, however there is fracture of 4th cervical vertebra. The tongue is cooked and charred and showed no evidence of remote scar or recent bleeding.

**RESPIRATORY SYSTEM:**  The acutely congested lungs weigh an estimated 900 grams (right lung weighs 550 grams and left lung weighs 450 grams) and show bilateral anterior contusions on the right and left lungs. Tracheobronchial system and parenchyma are otherwise without note.  There is cooked mucosal surface of the trachea.

**CARDIOVASCULAR SYSTEM:**  The 375 gram heart shows no external abnormalities. Epicardial surface and murual endocardium are smooth. Patchy areas of atherosclerosis of the right and right coronary arteries result in luminal compromise estimated at 5%. The right ventricle thickness is .4 cm. and left ventricle thickness is 1.4 cm. and are without note. Valvular structures and coronary ostia are unremarkable. Thoracic and abdominal aorta show moderate atherosclerosis.  No pulmonary thromboembolism is seen.

**HEPATOBILIARY SYSTEM, PANCREAS AND SPLEEN:**  The liver weighs 1,650 grams and shows multiple lacerations and cooked as well as charred parenchyma. Gallbladder, ductal system and pancreas are without note. The acutely congested spleen weighs 195 grams and is unremarkable.

**GENITOURINARY SYSTEM:**  The right kidney weighs 145 grams and left kidney weighs 150 grams with granular subcapsular surfaces and unremarkable parenchyma. Collecting systems, ureters and bladder are without note.  The bladder contains an estimated 200 ml. of yellow urine.

**GASTROINTESTINAL SYSTEM:**  The esophagus is unremarkable. The stomach contains 500 ml. of green vegetables with other unidentifiable food particles without visible medication.   Gastric and duodenal mucosa, small and large intestines, mesentery and appendix show no abnormalities.

**ENDOCRINE SYSTEM:**  The thyroid, pituitary and adrenal glands are without note.

**MUSCOSKELETAL SYSTEM:**  Fracture of the 4th cervical vertebra has been described. There is fracture of the 2nd and 3rd lumbar vertebra with surrounding soft tissue bleeding. The skull, remaining vertebral column, rib cage, sternum, pelvis and long bones of the extremities show no abnormalities.

**RETAINED MATERIAL:**
1)      Subclavian blood, urine, gastric contents and vitreous.
2)      DNA blood card and photographs are obtained.
3)      X-ray examination of the head, neck, chest and abdomen are performed.

ABRAMSON, Joseph
WV 2003-557

**PAGE 4**

## PATHOLOGICAL DIAGNOSES

D

I    Thermal burn injuries due to motor vehicle accident.

II   Multiple injuries including acute subarachnoid and subdural hemorrhage, fracture of the 4th cervical vertebra and 2nd and 3rd lumar vertebra, laceration of liver, contusion of the lungs and hemoperitoneum with an estimated 200 ml. of clotted and non-clotted blood.

III  Toxicology:  Non-contributory.

IV   Identification:  Accomplished by dental record as well as by means of association and exclusion.

**OPINON:**

Joseph Abramson, a 56 year old man, died as the result of thermal burn injuries as the driver of a car involved in a multi-car/truck collision.  It is unknown if the driver was restrained or unrestrained.  The manner of death is classified as Accident.

*Zia Sabet*   10-29-03

Zia Sabet, M.D.                        Date
Deputy Chief Medical Examiner

10/29/03

James A. Kaplan, M.D.          Date
Chief Medical Examiner

APPENDED:  Toxicology laboratory report **03-557** dated July 23, 2003.

ZS/JAK/rkm
10.17

### STATE OF WEST VIRGINIA
### OFFICE OF THE CHIEF MEDICAL EXAMINER
# TOXICOLOGY LABORATORY REPORT

D

| | | | |
|---|---|---|---|
| me of Deceased: | John Doe #2 | **Date of Death:** | 07-14-03 |
| se Number: | 03-557 | **Date of Request:** | 07-15-03 |
| :hologist: | Dr. Sabet | **Date Received:** | 07-16-03 |
| use of Death: | Multiple Injuries | **Manner of Death:** | Accident - Passenger |

| **Samples Received** | **Analysis Performed** |
|---|---|
| Subclavian Blood | ☒ Blood Alcohol |
| Heart Blood | ☐ Drugs of Abuse Immunoassay (Blood) |
| Urine | ☒ Drugs of Abuse Immunoassay (Urine) |
| Gastric | ☒ Alkaline Drug Screen (Urine) |
| Liver | ☐ Alkaline Drug Screen (Blood) |
| Vitreous Fluid | ☐ Acidic and Neutral Drug Screen (Blood) |
| Tissue _____ | ☒ Carbon Monoxide (Blood) |
| Other _____ | ☐ Other _____ |

## Results

| iple | Drug | Concentration | Therapeutic | Toxic | Lethal |
|---|---|---|---|---|---|
| ɔd | Ethanol | Negative | | | |
| od | Carbon Monoxide | Normal | | | |
| 1e | Pseudoephedrine/Ephedrine, Caffeine | Positive | | | |

## Comments

od hemoglobin saturation by carbon monoxide was not elevated.  Ephedrine and/or pseudoephedrine were
:cted in the urine, and can not currently be distinguished by the laboratory.  Caffeine was also present in the
1e.  No drugs or alcohol were detected in the blood.


*James Thraner*
James C. Kraner, Ph. D.
**Chief Toxicologist**

7/23/03
**Date**

f5 8 (In-House)
ISED:  5-12-03