**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

ALFRED ABRAMSON, as Executor
of the Estate of JOSEPH ABRAMSON,
deceased,

               Plaintiff,

v.                                    CIVIL  ACTION  NO.  3:04-0489

LANEKO ENGINEERING COMPANY;
LANEKO ENGINEERING, INC.;
RBL LEASING CORPORATION;
DAVID BRUCE SMALL,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is the motion of the plaintiff to determine an award of fees to Edison Hill and the law firm of Hill, Peterson, Carper, Bee & Deitzler.  The Court has reviewed the parties' briefings and heard oral argument in this matter on May 23 and 24, 2005.  For the reasons stated below, the Court **GRANTS** the plaintiff's motion and **AWARDS** as reasonable attorney fees to Hill, Peterson, Carper, Bee & Deitzler an amount equal to ten percent of the settlement and expenses as set forth herein.

The plaintiff initially retained Mr. Hill's firm in August 2003 to represent the estate of Joseph Abramson in a wrongful death action.  The plaintiff discharged the Hill firm in February 2004 and retained current counsel, David Batt and the law firm of Lobman, Carnahan, Batt, Angelle & Nader.  The case settled in March 2005 for $2.2 million, less a credit for previous payments, making the total settlement $2,156,000.  The Hill firm filed an attorney's charging lien to recover

fees and expenses for services provided.  According to testimony and documents filed with the court, the Hill firm and an associated firm accumulated $34,651.70 in expenses and contributed 146.25 hours of work in the course of its six-month representation of the plaintiff.

Although the parties disputed this issue in their briefings, at oral argument they conceded that quantum meruit is the appropriate legal standard for determining any fees due to Mr. Hill and his firm.  The general rule comes from the West Virginia Supreme Court of Appeals decision in *Clayton v. Martin*, 151 S.E. 855, 856-57 (1930): "If the contract between attorney and client be broken without fault on the part of the attorney, he may recover damages for breach, or on quantum meruit, for the reasonable value of his services. In either case the jury must be furnished with evidence of the damage, or with evidence of the value of the services rendered. But if the compensation under the contract is contingent on the success of the suit, and the attorney is discharged without fault on his part, the measure of damages is not the contingent fee, but a reasonable compensation for the services actually rendered."  This rule was reaffirmed by the court in *Hardman v. Snyder*, 393 S.E.2d 672 (1990), and appears to be the general rule in most jurisdictions. *See* 56 ALR 5th 1.

Determining reasonable compensation for legal services involves weighing several factors. The West Virginia Supreme Court of Appeals has addressed the factors to be considered a number of times.  In Syllabus Point 3 of *Stafford v. Bishop*, 127 S.E. 501 (1925), the Court summarized the factors as "the attorney's ability, skill, experience, diligence, and standing in his profession, as well as the nature and extent of the services performed, the difficulties encountered, the responsibility assumed, the amount involved, the physical and mental labor expended, the results achieved, their benefit to the client, and the usual and customary charges for like services in the same vicinity."

-2-

Although the factors have since been restated and expanded, the analysis remains largely unchanged.

In *Statler v. Dodson*, 466 S.E.2d 497 (1995),  the court listed the factors regarding a reasonable fee

in Rule 1.5(a) of the Rules of Professional Conduct:

> 1)   the time and labor required, the novelty and difficulty of the questions involved, and
>      skill requisite to perform the legal service properly;
> 2)   the likelihood, if apparent to the client, that the acceptance of the particular
>      employment will preclude other employment by the lawyer;
> 3)   the fee customarily charged in the locality for similar legal services;
> 4)   the amount involved and results obtained;
> 5)   the time limitations imposed by the client or by the circumstances;
> 6)   the nature and length of the professional relationship with the client;
> 7)   the experience, reputation, and ability of the lawyer or lawyers performing the
>      services; and
> 8)   whether the fee is fixed or contingent.
> *Id.* at 505-06.

The court then noted that it generally considered a greater range of factors, such as those outlined

in the syllabus of *Aetna Cas. & Sur. Co. v. Pitrolo*, 342 S.E.2d 156 (1986):

> The reasonableness of attorney's fees is generally based on broader factors such as:
> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the
> skill requisite to perform the legal service properly; (4) the preclusion of other
> employment by the attorney due to acceptance of the case; (5) the customary fee; (6)
> whether the fee is fixed or contingent; (7) time limitations imposed by the client or
> the circumstances; (8) the amount involved and the results obtained; (9) the
> experience, reputation, and ability of the attorneys; (10) the undesirability of the
> case; (11) the nature and length of the professional relationship with the client; and
> (12) awards in similar cases.

*Id*. at 506.  These cases firmly establish that in determining the fair value of an attorney's services,

the court is to consider many factors beyond the number of hours devoted to a case.

The plaintiff contends that despite the number of factors to be weighed, the conclusion must

ultimately be based on an hourly rate because that is the only objective method of determining the

fee.  Adopting this position would put the Court at odds with West Virginia case law and result in

an award that would not reflect the true value of the services provided by the Hill firm.  The

-3-

Supreme Court of Appeals addressed a similar issue in *Kopelman and Associates, L.C. v. Collins*, 473 S.E.2d 910 (1996). Although the case there involved dividing fees after a lawyer left a firm and took clients with him, the fundamental issue is the same: "whether the reasonable value of services rendered by a discharged law firm in a contingency fee case can be compensated adequately by merely multiplying the number of hours spent on the case by a billable hourly rate." *Id.* at 918. The court concluded that it could not, because although an hourly rate would be the easiest, most clear-cut method for determining a fee, it would not necessarily produce an equitable result. Courts, therefore, must look at a range of factors to arrive at reasonable compensation. *Id.* In making its determination, the *Kopelman* court relied in part on a Minnesota case in which an attorney filed a charging lien to recover fees after justifiably withdrawing from a contingency fee case. *Ashford v. Interstate Trucking Corporation of America, Inc.,* 524 N.W.2d 500 (Minn.Ct.App.1994). The Minnesota appellate court found that determining the appropriate fee based on quantum meruit was not limited to multiplying the number of hours worked by the former attorney's rate. *Id.* at 503. "Such a rigid rule would not allow due consideration to the relevant circumstances surrounding either a discharge or a withdrawal." *Id.* Accordingly, even though the contingency fee contract was no longer valid, the court approved an award of half the amount of the successor's contingency fee because the lower court had evaluated appropriate quantum meruit factors in arriving at a reasonable fee. Other courts have also made quantum meruit awards well in excess of an award based on an hourly rate. *See, e.g., Covington v. Rhodes*, 247 S.E.2d 305 (N.C.App. 1978)(Approval of lower court's quantum meruit award of $2,000, where hourly rate total was $1032.50.); *Goldstein and Price, L.C. v. Tonkin & Mondl, L.C.,* 974 S.W.2d 543, 549 (Mo.App. E.D. 1998)(Finding no error in quantum meruit award greatly exceeding hourly rate, noting that the "time taken to perform the

services is only one element considered, and usually of minor importance.") Although it is true, as the plaintiff argued, that many quantum meruit awards are based on an attorney's hourly rate, the determination of a reasonable fee must be determined on a case-by-case basis because it is impossible to establish a rule that would apply to all factual situations. *See, e.g, May v. Seibert*, 264 S.E.2d 643, 648 (1980). It is for that very reason the courts have recited lists of factors to weigh in each case. Since a contingent fee is customary for this type of legal representation and the plaintiff contemplated paying a contingent fee in his contracts with each counsel, a contingent fee is the appropriate method of determining the reasonable fee here. Having considered the various factors in relationship to the evidence adduced by the parties in this case, the Court finds that a fee based on nothing more than an hourly rate would be inappropriate and that instead, the Hill firm is entitled to a fee equal to a percentage of the gross settlement plus reimbursement of expenses in the amount of $32,701.70.[1]

The Court also finds that the plaintiff's decision to terminate the Hill firm was not based on any good cause. The evidence reveals that the plaintiff was satisfied with the level and quality of services the Hill firm provided but became unhappy with the amount of the contingency fee. The Court rejects the plaintiff's assertion in this proceeding that he had reason to complain of the Hill

---

[1] The Hill firm retained Dr. Michael Brookshire as a forensic economist. Dr. Brookshire charged $1,950 for his evaluation and report. After submitting his report and being paid for his services to that point, he chose to terminate his involvement in the case. He explained that he was uncomfortable with accepting the case because the decedent, like Dr. Brookshire, was employed as a professor at Marshall University and that he had raised this concern with Mr. Hill, who reassured him that it would not be a problem. Later, when Mr. Hill was no longer counsel, Dr. Brookshire decided to end his relationship to the case out of concern about his connection to the decedent. The plaintiff then had to retain and pay for a new economic loss expert. The risk that Dr. Brookshire would be unable or unwilling to complete his service to the case should be borne by Mr. Hill, not by the plaintiff. Therefore, his bill should not be reimbursed.

firm's strategy or the work accomplished before discharge.  While the plaintiff has a right to discharge counsel with or without cause, the Court does not accept the plaintiff's complaints that Mr. Hill was too quick to pursue a settlement or that he failed to aggressively prepare the claim. These belated complaints are contradicted by evidence of the plaintiff's satisfaction with everything except the fee he had earlier agreed to pay.  The decision to terminate the Hill firm is what prevented it from taking the next steps to advance the claim, not any lack of diligence on the firm's part.

In determining the reasonable fee to which Mr. Hill is entitled, the Court is persuaded that Mr. Hill made a substantial contribution to the successful settlement of the wrongful death case. First, Mr. Hill's firm is well-known for its personal injury litigation experience and was characterized by two defense lawyer witnesses as being regarded highly in this area.  The firm has handled many wrongful death claims and frequently litigates personal injury cases in the courts in this state.   Here, the evidence makes clear that the Hill firm quickly initiated a thorough investigation of the collision.  That investigation included hiring and directing an experienced investigator to document and preserve evidence critical to establishing liability and preserving damages.  The firm's investigation covered the circumstances of the collision to confirm that the decedent was not at fault and that he was wearing a seat belt.  Pinning down eyewitnesses and investigating officers are routine but nonetheless critical steps in anticipation of making a claim. The Hill firm arranged for essential experts on trucking standards and economic loss, hiring David Stopper to prepare a report concerning the liability of the truck and assembling information for Dr. Brookshire's analysis and report on economic damages. The firm also sought, analyzed and preserved evidence to determine if there might be other potential tortfeasors.

Mr. Hill developed a sound strategy to initiate contact with the insurance carrier to determine

whether an early settlement was possible and to build a case for any breach of West Virginia bad faith laws or an excess coverage duty.  Mr. Hill composed a demand letter advising the insurer of its duty to make a fair and prompt settlement offer and directly communicated with the insurer to exchange information and to schedule a mediation session.  With its co-counsel, the Hill firm began drafting a complaint that incorporated the basic facts and primary theories of liability and damages. The firm advanced approximately $34,000 in expenses for the investigator, experts and other necessary costs, and invested 146 hours of work in the case.

From Mr. Hill's testimony, well supported by the e-mail correspondence with Alfred Abramson, the plaintiff seemed satisfied with Mr. Hill's services and approved his handling of the claim until the mediation was arranged.  Then, according to Mr. Hill, the plaintiff expressed concern over the contingency fee he had agreed to pay and asked the firm to reduce it.  Mr. Hill declined, and the plaintiff abruptly discharged his firm.  At that point, although mediation had been scheduled and the insurer had committed to making a significant offer to settle the case, no specific settlement demand had been made by Mr. Hill and no offer had been extended by the insurer.  The lawsuit had yet to be filed.  Mr. Hill testified that his firm has a practice of reducing its fees when an early settlement is reached.  He asks for a fee of twenty-five percent in this proceeding.

The plaintiff retained Mr. Batt's firm to take over the case.  He filed a complaint, a substantial portion of which was identical to the draft completed by the Hill firm.  The complaint included defendants that Mr. Hill had not planned to add, but the primary claims were the same.  Mr. Batt disclosed as experts Dr. Brookshire and Mr. Stopper, but also added a forensic pathologist and replaced Dr. Brookshire.  According to defense counsel, shortly after Mr. Batt assumed the case, the parties discussed rescheduling the mediation session.  Mr. Batt, however, believed it was premature

and declined to enter into settlement negotiations until he pursued several aspects of the case.

Defense counsel than made an offer of settlement in the amount of $800,000.  Later, when mediation was arranged and impending, the defendants increased the offer to $1 million.  The mediation took place on March 18, 2005, and the parties succeeded in settling the case.  Defense counsel testified that he and his insurance carrier had placed a settlement value of $2 million on the case before Mr. Hill's discharge and before the first mediation arranged by Mr. Hill.  He stated further that this valuation was based on what Mr. Hill had presented and on what the insurer had gathered in its investigation of the claim.  He also testified that the insurer's valuation of the case did not change after Mr. Batt took over.

Mr. Batt testified that he had expended well over 700 hours on the case and incurred expenses of about $27,000.  He testified that he more thoroughly investigated and prepared arguments for pain and suffering damages under West Virginia law and for punitive damages than had the Hill firm.  He also added parties and claims, most of which survived the defendants' motion to dismiss as a result of his efforts but ultimately had little effect on the outcome.  Under his contract with the plaintiff, his fee will be a contingent fee of twelve percent.

Applying the factors that guide the Court's determination, a number weigh in favor of a substantial fee for the Hill firm.  The firm provided the foundation, both in terms of the evidence it assembled as well as the claim analysis, for the theories advanced by the plaintiff.  The Hill firm demonstrated its high level of skill in creating this foundation in a relatively short period of time.  Although in some respects the claim was neither novel nor particularly difficult, given relatively certain liability, the Hill firm performed competently in investigating the case, obtaining experts and initiating matters with the insurer.  Equally apparent is the commitment the firm made to the claim

as shown in its frequent communications with the client and its expenditure of a significant amount of money pursuing the claim.[2]

Last, and perhaps most important, Mr. Hill's work was relied upon by the plaintiff, and must be at least partially credited for leading to the settlement. To the extent the insurer's valuation and decision to offer the amount the plaintiff ultimately accepted was based on the case presented through his lawyers, the result achieved was within reach when the Hill firm was still on the case. The insurer paid, and the plaintiff accepted, an amount within the range already determined by the insurer based in part on the work done by the Hill firm. The Court finds that Mr. Hill's work along with that of current counsel were essential in obtaining the result.

Several factors temper the fee determination. The Hill firm represented the plaintiff for only six months. The firm had not filed the lawsuit and did not plan to do so before the mediation. No offer of settlement had actually been made, only an uncertain commitment by the insurer to make a substantial settlement offer in the mediation. Even though the insurer had already estimated the settlement value at the $2 million level, neither the Hill firm nor the plaintiff was aware of that fact. The Court cannot assume that Mr. Hill's mediation would have resulted in settlement. The plaintiff's new counsel contributed much work litigating the case after he filed the lawsuit. Often, an insurer is persuaded to make its best offer only after the lawsuit has been filed and discovery and litigation issues have been pursued. The mediation took place a few months before trial, after current counsel was able to more fully develop certain aspects of the case. The Court cannot assume that the current counsel's work on the case was any less critical to the ultimate settlement than the Hill firm's

---

[2] With this devotion of time and resources, the firm undoubtedly deferred work on other cases, although to not a great extent. This factor is of little weight.

contribution, nor will the Court second-guess Mr. Batt's handling of the lawsuit.  If one thing is certain, it is that both firms performed competently and diligently to advance the plaintiff's interests and that their respective contributions resulted in the settlement.  In any event, the fee award for Mr. Hill  must be determined without regard to Mr. Batt's fee.

The Court **APPROVES** a fee in the amount of $215,600, representing ten percent of the settlement[3] and expenses of $32,701.70.  The plaintiff is **DIRECTED** to pay the fee and expenses promptly upon receipt of the settlement proceeds. The Court **DIRECTS** the Clerk to send a copy of this written opinion to counsel of record and any unrepresented parties.

ENTER:        May 26, 2005

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[3] The plaintiff reported the terms of the settlement as $2.2 million, less a credit for sums already received, for a total of $2.156 million.  Because it is not clear to the Court precisely what the credits involve, and because Mr. Batt's fee is calculated on the $2.156 figure, the award here is also based on that figure.

-10-